No. 08-2294
════════════════════════

**In The**
**United States Court of Appeals**
**for the Seventh Circuit**

────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID R. OLOFSON,

*Defendant-Appellant.*

────────────────

**On Appeal from the United States District Court**
**for the Eastern District of Wisconsin**

────────────────

**Brief of Appellant**

────────────────

ROBERT E. SANDERS          HERBERT W. TITUS*
  MARK BARNES & ASSOCIATES      WILLIAM J. OLSON
  1350 I Street, N.W., Suite 1255   JOHN S. MILES
  Washington, DC 20005         JEREMIAH L. MORGAN
  (202) 408-5030             WILLIAM J. OLSON, P.C
                              8180 Greensboro Drive, Suite 1070
                              McLean, VA 22102-3860
                              (703) 356-5070

*Attorney of Record

August 25, 2008

                Counsel for Appellant

════════════════════════

## APPELLANT'S DISCLOSURE STATEMENT

The defendant-appellant herein, David R. Olofson, through his undersigned counsel, submits this Disclosure Statement pursuant to Rule 26.1(b), Federal Rules of Appellate Procedure ("Fed. R. App. P."), Rule 26.1(c), Rules of the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit Local Rules"), and Fed. R. App. P. 28 (a)(1):

1.  The defendant-appellant, David R. Olofson, is a natural person, and not a corporation.  Mr. Olofson now is represented herein by Herbert W. Titus, Esquire, who is counsel of record, and William J. Olson, Esquire, of William J. Olson, P.C., 8180 Greensboro Drive, Suite 1070, McLean VA 22101, and by Robert E. Sanders, Esquire, of Mark Barnes & Associates, 1350 I Street, N.W., Suite 1255, Washington, D.C. 20005.

2.  The defendant-appellant, David R. Olofson, was previously represented herein by Brian T. Fahl and Brian P. Mullins, Federal Defender Services of Wisconsin, Inc., who also represented Mr. Olofson in the District Court — the United States District Court for the Eastern District of Wisconsin.  Prior to such representation by Messrs. Fahl and Mullins, Mr. Olofson was represented in the District Court by Christopher Rose of the law firm of Rose & Rose, 5529 6th Avenue, Kenosha, WI  53140.

3.  The plaintiff-appellee is the United States of America, represented by Assistant United States Attorney Gregory J. Haanstad, 517 E Wisconsin Ave, Room 530, Milwaukee, WI  53202.

# TABLE OF CONTENTS

Appellant's Disclosure Statement

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of the Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Argument

I.      The District Court Denied Olofson a Fair Trial by its Failure to
        Include in the Jury Instructions the <u>Staples</u> Definition of
        "Automatically". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

        A. Olofson's Requested <u>Staples</u> Instruction Represents an Accurate
           Statement of the Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

        B. Olofson's <u>Staples</u> Instruction Reflects a Theory that Is Supported by the
           Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

        C. Olofson's Proposed <u>Staples</u> Instruction Reflects a Theory Not Already
           Part of the Charge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        D. The Failure to Include the Defendant's <u>Staples</u> Instruction Denied
           Olofson a Fair Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

II.     As a Matter of Law, the Evidence Was Insufficient to Support a
        Conviction under Sections 922(o) and 924(a)(2). . . . . . . . . . . . . . . . . . . . .  26

        A. The Trial Court Applied an Erroneous Legal Standard to the
           Sufficiency of the Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

        B. The Record Is Devoid of Any Evidence to Support a Finding that at the
           Time of the Transfer of the AR-15 Olofson Knew that It Had the
           Essential Characteristics of a Machine Gun. . . . . . . . . . . . . . . . . . . . . . . .  29

i

III.   Without the <u>Staples</u> Interpretative Gloss on the Meaning of
       "Automatically," Olofson's Conviction under 18 U.S.C. Sections 922(o)
       and 924(a)(2) Is Invalid, the Statutes Being Void for Vagueness. . . . . . . . .   33

IV.    The Court Erroneously Excluded the Defense Firearms Expert from
       Trial During the Testimony of the Prosecution's Firearms Expert

       A.  Expert Testimony Was Essential to Aid the Jury in Determining whether
           Olofson's rifle Was a "Machinegun" under 26 U.S.C. section 5845(d). . . . . .   39

       B.  The Prosecutor and Defense Counsel Agreed Not to Sequester Witnesses,
           including Experts, but the Prosecutor Reneged. . . . . . . . . . . . . . . . . . . . . . .   40

       C.  The Court's Order Excluding Defense Expert from Trial during the
           Testimony of the Government's Expert Witness Was Prejudicial. . . . . . . . .   42

V.     The District Court Committed Prejudicial Error In Denying
       Defendant's Discovery Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

Certificate of Compliance

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-1

APPENDIX B (separately bound). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-1

# TABLE OF AUTHORITIES

**Page**

## CASES

Bouie v. City of Columbia, 378 U.S. 347 (1964)............................. 39

Brady v. Maryland, 373 U.S. 83 (1963). ................................. 47

Duncan v. Walker, 533 U.S. 167 (2001). ................................ 26

Kolender v. Lawson, 461 U.S. 352 (1983). ........................... 38, 39

Kotteakos v. United States, 328 U.S. 750 (1946). ....................... 50

Kyles v. Whitley, 514 U.S. 419 (1995). ................................ 50

Malek v. Federal Insurance Co., 994 F.2d 49 (2d Cir. 1993). ............. 42

Mayo v. Tri-Bell Industries, Inc., 787 F.2d 1007 (5th Cir. 1986). ........... 43

Pickens v. Runyon, 128 F.3d 1151 (7th Cir. 1997). ....................... 50

Staples v. United States, 511 U.S. 600 (1994)............................ 15

United States v. Aguilar-Espinosa, 57 F. Supp.2d 1359 (M.D. Fl. 1999)........ 35

United States v. Alvarez, 987 F.2d 77 (1st Cir. 1993)...................... 50

United States v. Asher, 178 F.3d 486 (7th Cir. 1999)...................... 50

United States v. Collins, 272 F.3d 984 (7th Cir. 2001)..................... 38

United States v. Copus, 93 F.3d 269 (7th Cir. 1996)....................... 27

United States v. Crabtree, 979 F.2d 1261 (7th Cir. 1992),
 cert. denied, 510 U.S. 878 (1993). .................................. 43

United States v. Edwards, 36 F.3d 639 (7th Cir. 1994). ..................... 18

United States v. Fawley, 137 F.3d 458 (7th Cir. 1998)...................... 18

United States v. Fleischli, 305 F.3d 643 (7th Cir. 2002)............... 15, passim

United States v. Meadows, 91 F.3d 851 (7th Cir. 1996). ............... 27, 30, 33

United States v. Miller, 199 F.3d 416 (7th Cir. 1999)...................... 50

United States v. Salerno, 108 F.3d 730 (7th Cir. 1997). .................... 50

United States v. Seschillie, 310 F.3d 1208 (9th Cir. 2002)................. 44, 45

Williams v. Taylor, 529 U.S. 362 (2000). ............................... 26

## FEDERAL RULES OF EVIDENCE

Rule 615.......................................................... 44, 45

Rule 703.......................................................... 42

## GOVERNMENT PUBLICATIONS

ATF Rul. 81-4, ATF Q.B. 1981-3 78..................................... 40

ATF Rul. 2004-5 (Aug. 18, 2004). .............................. 18, *passim*

ATF Guide to Investigating Illegal Firearms Trafficking (October 1997)..... 37, 38

## MISCELLANEOUS

Halbrook, S., Firearms Law Deskbook (2008 Edition). ............... 19, *passim*

Long, D., AR-15/M16: A Practical Guide, Paladin Press (1985). .............. 46

Webster's Third International Dictionary (1962). .......................... 36

# STATEMENT OF JURISDICTION

The district court below had jurisdiction pursuant to 18 U.S.C. section 3231, as this case involves a criminal indictment and conviction of David R. Olofson ("Olofson") for violation of 18 U.S.C. sections 922(o) and 924(a)(2), which prohibit the transfer of a machine gun.

Pursuant to 28 U.S.C. section 1291, this Court has jurisdiction over this appeal, a timely Notice of Appeal having been filed on May 18, 2008, from a final judgment and sentence entered on May 15, 2008, by the district court below.

# STATEMENT OF THE ISSUES PRESENTED

1.   Whether the district court's failure to include in the jury instructions defendant's requested definition of "automatically," as that element appears in the offense defined by 18 U.S.C. section 922(o), and as stated in <u>Staples</u> v. <u>United States</u>, 511 U.S. 600, 602 n.1 (1994), denied defendant a fair trial?

2.   Whether the district court erred in denying defendant's motion for acquittal based upon the insufficiency of the evidence?

3.   Whether the district court erred in denying defendant's motion for acquittal based upon the doctrine of void for vagueness?

4.   Whether the district court committed reversible error by its order excluding the defense expert from the courtroom during the testimony of the government's firearm expert?

5.   Whether the district court committed reversible error in denying defendant's discovery requests?

2

## STATEMENT OF THE CASE

This is an appeal from a criminal conviction for violation of the federal criminal prohibition against the knowing unlawful transfer of a machine gun, as set forth in 18 U.S.C. sections 922(o) and 924(a)(2).

On November 20, 2006, in response to a criminal complaint issued on November 17, 2006, David Roland Olofson ("Olofson") voluntarily appeared before a United States Magistrate to answer a charge of having violated Title 18, United States Code, section 922(o).  The magistrate released Olofson on his own recognizance, setting a preliminary hearing for December 6, 2006.  R. 1 and 2.[1]

On December 5, 2006, Olofson was charged in a one-count indictment of having knowingly transferred a machine gun in violation of Title 18, United States Code, sections 922(o) and 924(a)(2).  R. 9.  On December 6, 2006, Olofson entered a plea of not guilty and was continued on release.  R. 10.

On May 29, 2007, there was an evidentiary hearing on Olofson's Motion to Suppress Statements obtained from him by an ATF agent during a dynamic entry search of Olofson's home.  On August 28, 2007, the motion was denied.

On December 28, 2007, and in an effort to obtain exculpatory evidence in the government's possession, Olofson filed a Motion to Compel Discovery of documents, previously requested by letters dated September 25, 2007 and December 10, 2007.

---

[1]     "R." refers to the Record (or Docket) Number identified in the Docket Entries maintained and submitted with the record by the clerk of the district court. *See* App. B-1-13.

3

R. 65.  On January 3, 2008, the requests for documents 1, 3, 7, and 8 were

withdrawn (R. 71), and on January 7, 2008, the requests for documents 2, 4, 5, and

6 were denied.  Tr.[2] 2-6.

On January 7, 2008, the case was tried to a jury.  R. 72.  On January 8, 2008,

the jury returned a verdict of guilty.  R. 70.

On January 17, 2008, Olofson filed a motion for acquittal on the grounds of

insufficiency of the evidence and statutory void for vagueness.  R. 73.

On May 13, 2008, the district court denied the motion for new trial (Sent. Tr. 8-

9), and motion for acquittal (Sent. Tr. 21-23), and then sentenced Olofson to 30

months imprisonment and two years supervised release, ordering Olofson to

surrender for service as notified by the U.S. Department of Corrections.[3]  Sent. Tr.

64, 69.

---

[2]      References to the transcript of the evidentiary hearing on May 29,
2007, are cited as "Evid. Tr."  References to the transcript of the final pretrial
conference of January 3, 2008, are cited as "Pret. Tr."  References to the transcript
of the jury trial that took place on January 7-8, 2008, are cited as "Tr."  References
to the transcript of the sentencing hearing of May 13, 2008 are cited as "Sent. Tr."

[3]      Olofson began serving his sentence on July 2, 2008, and currently is
incarcerated at the Federal Correctional Institute at Sandstone, Minnesota.

4

## STATEMENT OF FACTS

### A. THE PROSECUTION.

#### 1. The Malfunctioning Firearm Precipitating Event.

On July 13, 2006, Defendant Olofson loaned Robert Kiernicki ("Kiernicki") an Olympic Arms AR-15-type CAR-AR semi-automatic firearm (hereinafter "AR-15") and a supply of ammunition "to keep [his] training up and to keep the skill of shooting" at a nearby shooting range, the Conservation Club ("the Club").  Tr. 37, l. 8 – 38, l. 14.  Kiernicki noticed the selector switch on the rifle could be rotated to a third position, other than "safe" and "fire."  Olofson told Kiernicki not to use the "third position" for then it would malfunction by firing a "three-round burst" and then jam up.  Tr. 38, ll. 8-21; Tr. 46, ll. 11-15.  Nevertheless, at the Club, Kiernicki "more than once," placed the weapon "in the unmarked third position."  After pulling the trigger only once each time, the firearm shot "three rounds or maybe four ... and then it jammed" (Tr. 39, ll. 15-16), even though there was still ammunition in the gun and he had not released his finger from the trigger.  Tr. 46, l. 22 – 47, l. 8.

In response to a telephone complaint that "there was automatic machine gun fire" at the Club, the Berlin police arrived at the Club, asked Kiernicki if he was "the one doing that," and took down the serial numbers of three guns, including Olofson's AR-15.  Tr. 40, ll. 3-22.  Later, on the same date, the Berlin police came to Kiernicki's home and "took Olofson's gun from" him.  Tr. 41, ll. 8-10.

**2.  The Dynamic Entry Search and ATF Interrogation.**

On July 19, 2006, six days after the incident at the Club, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereinafter "ATF"), along with the Berlin Police Department and the Green Lake County Sheriff's Department SWAT team — 20 persons in all, many of whom were in full SWAT gear and with guns drawn — executed a search warrant by "dynamic entry" of Olofson's home to search for "firearms and documents." Evid. Tr. 6, l. 25 – 7, l. 12; Tr. 18, l. 24 – 19, l. 16.  After answering the knock on his door, Olofson was taken "into custody" by "secur[ing] him and handcuff[ing] him" and placing him in a squad car.  Evid. Tr. 8, ll. 2-16; Evid Tr. 9, ll. 13-14.  Olofson's two children — ages 7 and 4 — were also taken "into custody and placed" in a separate squad car.  Evid. Tr. 9, ll. 2-10; Evid. Tr. 19, ll. 19-21.

During a subsequent three-hour police station interview, Olofson told ATF agent Jody Keeku ("Keeku") that he had loaned the AR-15 to Kiernicki to "maintain his firearm skills" (Tr. 62, l. 21 – 63, l. 3), and, in response to the agent's statement that the AR-15 "had fired automatically," Olofson replied that "if that happened then it was a malfunction."  Tr. 68, ll. 1-16.  The three hour and forty-five minute dynamic entry search of the Olofson home yielded no evidence of any possible additional firearms offenses, even though the search uncovered "10 to 13 long guns ... and three handguns" (*see id.*, 70, ll.19-23), none of which was an "automatic."  Tr. 68, ll. 17-21.

6

### 3.  The Conflicting ATF Firearm Tests of Olofson's AR-15.

Four months after the search and ATF interrogation, on November 17, 2006, ATF agent Keeku filed a Criminal Complaint alleging that, on or about July 13, 2006, Olofson "knowingly transferred a machine gun ... in violation of Title 18, United States Code, Section 922(o)."  As part of the factual support for the complaint Agent Keeku's Affidavit stated:

> On November 6, 2006, a Firearms Enforcement Officer
> with ATF test fired the Olympic Arms, serial number
> F7079 ... us[ing] 60 rounds of commercially available, .223
> caliber ammunition.  Three tests were performed, each
> with twenty rounds of ammunition.  When the selector
> switch was placed in the unmarked third position, the
> firearm fired all twenty rounds automatically in each of
> the three tests.  [Keeku Affidavit, p. 3, R. 1 (App. B-17).]

Omitted from the Keeku Affidavit was mention of an earlier test, conducted "in October of 2006" (Tr. 101, ll. 6-13), by the same ATF officer, utilizing "commercially available ammunition" (*see* Tr. 107, l. 17), in which Olofson's AR-15 did not fire "automatically," as the testing officer had expected it to do (Tr. 107, ll. 4-10), but instead had malfunctioned by "hammer follow."  Tr. 122, l. 23 – 123, l. 2.  *See also* Tr. 106, ll. 1-21.  Based on this initial test, the testing officer determined that "this gun was not a machine gun."  Tr. 124, l. 21 – 125, l. 1.

Thereafter, agent Keeku requested a retest. Tr. 125, ll. 9-17.  This time, utilizing a "softer primed ammunition" (Tr. 126, l. 17 – 127, l. 12), the testing agent testified that, as he had done in the first test (Tr. 104, l. 22 – 105, l. 6.), he tested the firearm in the "safe" position, but then skipped the semi-automatic position, explaining that

he did so because he "already knew that it would function." Tr. 127, l. 20 – 128, l. 2.

After putting 20 rounds of ammunition in the magazine, he testified that he placed

the AR-15 in the third position, and holding "the trigger down ... it emptied all 20

rounds without any stoppage." Tr. 109, ll. 16-19.  Following this test, the agent

twice placed 20 more rounds of ammunition in the firearm, and "fired in five to 10

round bursts by [himself] functioning the trigger in five to 10 round bursts and the

weapon fired automatically each time." Tr. 109, ll. 20-25.  As a result of this test,

the ATF agent concluded that the Olympic AR-15 was a machine gun, because it

fires "more than one round by a single function of the trigger." Tr. 110, ll. 1-7.

Later, in February 2007, the ATF agent tested the AR-15 a third time, the test

being videotaped as ordered by a different trial judge then assigned to the case,

without requiring the government to ensure defense presence, providing  however,

that Olofson "should be allowed to examine the video." Docket 29.  Played at trial

(Tr. 111, l. 15), and again at the sentencing hearing (Sent. Tr. 9, ll. 22-25), the

videotaped test showed that, in the unmarked third position, the gun "fired ... more

than one round without manual reloading by a single function of the trigger." Tr.

111, l. 17 – 112, l. 18.

**B. THE DEFENSE**

**1. Olofson's Motion to Compel Discovery of Documents.**

Upon examination of Olofson's AR-15, the ATF testing agent found that it had

been assembled with **four** M-16 components — "the trigger, the hammer, the

disconnector, and the selector switch" but neither a M-16 bolt carrier, nor an M-16

8

auto sear.  Tr. 102, ll. 1-6; Tr. 131, ll. 15 – 132, l. 7.  The testing agent averred that

these four parts would "allow it to fire ... more than one round with a single pull of

the trigger, and "therefore [Olofson's AR-15 firearm] constituted a machine gun,"

(Tr. 102, ll. 7-19), even if the multiple bursts were stopped by a malfunction (the

gun having jammed), and not by the release of the trigger or the exhaustion of

ammunition.  Tr. 137, l. 15 – 138, l. 6.  Yet, the testing agent agreed that the AR-15

to M-16 conversion manual — introduced by the government as having been seized

from Olofson's home (*see* Tr. 73 l. 12 – 74, l. 19) — did not state that an AR-15 could

be converted into an M-16 machine gun only by the insertion of the four M-16 parts

that he found in Olofson's AR-15.  Tr. 138, l. 20 – 140, l. 14.  When asked whether

Olofson's AR-15 had been manufactured by SGW/Olympic Arms with the inclusion

of these M-16 parts, the expert replied in the negative, but said that he had not

contacted the manufacturer "about this particular rifle."  Tr. 118, ll. 17-23.

Prior to trial, on two occasions, Olofson's counsel sought to obtain from the

prosecution documents relating to ATF firearms testing procedures and

classification standards related to the AR-15 with M-16 components, as well as ATF

correspondence with the manufacturer (Olympic Arms) of Olofson's AR-15, using M-

16 parts.  Motion to Compel Discovery of documents, 2-3 (R. 65).  At the January 3,

2008, pretrial conference, the prosecution informed the court that it had not yet

determined whether any such documents existed, and that, even if they did,

maintained that they were not producible.  Pret. Tr. 20, ll. 3-18.  In response, the

court stated that, until it was determined whether such documents exist, it would

9

be impossible to ascertain whether "the government ... should turn over that information as Brady material or for other reasons under the Federal Rules of Criminal Procedure," whereupon the prosecution promised to "do [his] best to find out [if such documents exist] by the end of the day." Pret. Tr. 20, l. 19 - 21, l. 11.

Four days later, on the first day of trial, the prosecution told the court that it was satisfied that the ATF/Olympic Arms letter existed, but that it was not discoverable, both because it was not exculpatory and because it might be protected from disclosure by section 6103 of the Internal Revenue Code. Tr. 2, l. 17 – 4, l. 6. As for the other two documents, the prosecution was unable to determine if any such documents exist because it would require a "search [of] a monstrous data base." Tr. 3, ll. 10-18. In response, defense counsel proffered that it was his understanding that "this particular model weapon that's at issue here ... was made with M-16 internal parts" and that the requested letter "acknowledges ... these internal M-16 parts," suggesting "that these guns be recalled or sent back to have those parts fixed so that the guns would not malfunction" (Tr. 4, ll. 10-24):

> So if the Government's proof is going to be that the presence of these internal M-16 parts are what ... makes this gun a machine gun, then I think the letter is ... exculpatory and discoverable underneath Brady; and I'm not sure necessarily on how the 6103 tax records would protect this kind of document. [Tr. 4, l. 25 – 5, l. 6, App. B-28.]

The court ruled that "I cannot conclude that the information you're requesting is ... exculpatory" under Brady, and denied the motion as to the ATF/Olympic Arms letter. Tr. 6, ll. 1-15, App. B-29.

### 2.  The Exclusion of Defense Expert Witness.

At trial, the prosecution and defense counsel originally agreed "that we would allow our witnesses in throughout the entire trial."  Tr. 91, ll. 4-6.  Immediately prior to the testimony of its expert firearms testing agent, however, the prosecutor informed the court that the prosecution would like to sequester defense expert during the government expert's testimony.  Tr. 90, ll. 10-13.  In response, defense counsel argued not only that the prosecution should be held to his previous word, but also that "under Rule 703 it's clear that an expert can testify to factual data ... that are just made known to the expert [the] day [of] the hearing."  Tr. 91, ll. 10-13.

Without explanation, the court ruled in the prosecution's favor, "exclud[ing] [defense expert] from the trial during ... that portion of the trial where the government is offering what it believes to be expert testimony."  Tr. 95, ll. 6-11, App. B-35.  Thus, defendant's expert was limited in his testimony to a brief "function check" of the firearm (Tr. 166, ll. 8-18), a review of the prosecution two expert reports (Tr. 171, ll. 14-15; Tr. 179, ll. 5-8), and viewing a portion of the video at trial.  Tr. 176, ll. 15-19.

### 3.  The Jury Instruction on the Definition of a Machine Gun.

In his opening statement, the prosecution told the jury that a firearm is a "machine gun" "if [it] expels more than one round with a single pull of the trigger...."  Tr. 12, ll. 7-9.  In his closing argument — after quoting the statutory definition which states that a machine gun is "[a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one

shot, without manual reloading, by a single function of the trigger" — the

prosecution told the jury:  "That is, if you have a gun, you pull the trigger once and

more than one shot is fired, that firearm is a machine gun."  Tr. 188, l. 20 – 189, l.

2.  Indeed, the prosecution repeatedly argued this definition to the jury.  *See* Tr.

189, ll. 10-14, 17-24.  Thus he summed up, that "under the legal definition of

'machine gun' that you're going to be asked to apply, Mr. Olofson's gun qualifies

because, as Mr. Kingery testified, as Mr. Kiernicki testified, and as you yourselves

all saw in the video, when you pull the trigger once on that firearm more than one

round is fired."  Tr. 190, l. 24 – 191, l. 4.

   Prior to trial, defense counsel attempted to nip in the bud the prosecution's

expansive machine gun definition:  (a) contesting its application to a

"malfunctioning" AR-15 (Pret. Tr. 25, ll. 9- 21); (b) noting that the AR-15 is the

"same exact model of firearm [at issue] in the case Staples vs. United States...."

(Pret. Tr. 25, l. 22 – 26, l. 2); and (c) submitting to the court "language from the

Staples case which talks about firing until the trigger is released and until the

magazine is empty[,] the language is from Staples[4] [as] adopted by the Seventh

Circuit in the Fleischli case."[5]  Pret. Tr. 26, ll. 20-23, App. B-22-24; *see also* Pret. Tr.

---

[4]    Staples v. United States, 511 U.S. 600, 602, n. 1 (1994) ("[T]he term[]
"automatic" ... refer[s] to a weapon that ... once its trigger is depressed, the weapon
will automatically continue to fire until its trigger is released or the ammunition is
exhausted.")

[5]    United States v. Fleischli, 305 F.3d 643, 655 (7th Cir. 2002) ("We think
the Court's meaning [in Staples] is plain enough.  If [a firearm], with one
application of the trigger, continue[s] to fire until the trigger was released or the

34, ll. 18-19, App. B-25.  The prosecution opposed such an instruction on the ground that the <u>Staples</u> definition "seems to be inconsistent with the statutory definition which provides that a machine gun is any weapon that shoots more than one shot without the manual reloading by a single function of the trigger."  Pret. Tr. 35, ll. 5-8.

Initially, the Court "reserve[d] judgment with regard to the defendant's request to include language from *Staples* - footnote 1."  Court Minutes, p. 2 (R. 71).  *See also*, Tr. 35, ll. 11-12.  Ultimately, however, the court agreed with the prosecution, declining Olofson's request that the jury be given a specific instruction containing the <u>Staples</u> definition delimiting the "automatic" element of a machine gun.  *See* Tr. 219, l. 25 – 220, l. 3, App. B-36-37.

## SUMMARY OF ARGUMENT

This case concerns the trial and conviction of David Olofson for having knowingly transferred a machinegun in violation of 18 U.S.C. sections 922(o) and 924(a)(2).  At issue in the case was whether Olofson's semiautomatic AR-15 rifle met the governing statutory definition of a machinegun, as set forth in 18 U.S.C. section 921(a)(23) and 26 U.S.C. section 5845(b), that is, "any weapon which shoots, is designed to shoot ... **automatically** more than one shot, without manual reloading, by a single function of the trigger."  (Emphasis added.)

---

ammunition exhausted, it [is] a machine gun....").

13

According to the prosecution, Olofson's AR-15 was a machinegun because "if you have a gun, you pull the trigger once and more than one shot is fired, that firearm is a machine gun."  Tr. 188, l. 17 – 189, l. 2.  According to Staples v. United States, 511 U.S. 600, 602 n. 2 (1994) and United States v. Fleischli, 305 F.3d 643, 655 (7th Cir. 2002), however, a firearm, to be classified as a machinegun, must not only fire more than one shot at the single function of the trigger, but must fire "automatically," that is, "continue to fire until the trigger is released or the ammunition is exhausted."  The prosecution case showed that at the time Olofson transferred his rifle, Olofson knew it would sometimes malfunction, firing more than one round by a single pull of the trigger and then jamming, discontinuing fire even though the trigger had not been released and the ammunition had not been exhausted.  To counter this effort to criminalize rifle malfunctions causing multiple rounds to be fired without the release of a trigger or exhaustion of ammunition, Olofson requested an instruction defining "automatically," as set forth in Staples and Fleischli.  The court erroneously declined to give the instruction, thereby denying Olofson a fair trial.

Furthermore, the trial court erred in denying Olofson's motion for acquittal on the grounds of insufficiency of the evidence and the doctrine of void for vagueness. In its review of the evidence, the court applied the government's interpretation of the meaning of "automatically," not the Staples/Fleischli definition.  Under the latter definition, the record is void of any evidence that Olofson's AR-15 was a machinegun or, even if it was, that Olofson knew that the AR-15 possessed the

essential characteristics of a machine gun, as required by <u>Staples</u>.  Moreover, if the sufficiency of the evidence is measured without the <u>Staples</u>/<u>Fleischli</u> interpretative gloss, then Olofson's conviction cannot stand because the statutory definition of machinegun, without a specific definition of "automatically," is void for vagueness, insufficient either to give fair warning of "what conduct is prohibited" or to guard against "arbitrary and discriminatory enforcement."

Finally, the trial court erred to Olofson's prejudice by its order excluding the defense expert from the courtroom during the testimony of the government's firearms expert, thereby depriving Olofson:  (i) of the full benefit of the witness's expertise in the cross-examination of the government expert; and (ii) of rebuttal expert opinion as provided for by Rule 703, F. R. Evid.  Additionally, the trial court abused its discretion in denying Olofson's discovery requests for exculpatory ATF documents, namely:  (i) documents governing the procedures and standards for the testing of an AR-15 to ascertain whether it is a machinegun; and (ii) correspondence with the manufacturer of Olofson's AR-15 to ascertain whether it had been made lawfully with machinegun parts.


## ARGUMENT

**I.    The District Court Denied Olofson a Fair Trial by its Failure to Include in the Jury Instructions the <u>Staples</u> Definition of "Automatically."**

Defendant Olofson was indicted for, and convicted of, having knowingly transferred a machine gun in violation of 18 U.S.C. sections 922(o) and 924(a)(2).

15

Even though the offense charged appears in Title 18, the operative definition of

"machine gun" appears in the Internal Revenue Code (26 U.S.C. section 5845(b)).

*See* 18 U.S.C. section 921(a)(23).  The tax code definition, in turn, identifies a

"machine gun" as a firearm possessing several technical characteristics, including

the requirement that the firearm function "automatically."  As this Court observed

in United States v. Fleischli, 305 F.3d 643 (7th Cir. 2002), however, the "automatic"

characteristic of a machine gun is "not defined in the statute or regulations."  *Id.* at

655.  Finding no such definition to guide its effort to determine whether a particular

firearm was a machine gun, the Fleischli Court applied the definition of automatic

that the Supreme Court had previously formulated in Staples v. United States, 511

U.S. 600 (1994):

> As used [in our application of section 5845(b)], the terms
> 'automatic' and 'fully automatic' refer to a weapon that
> fires repeatedly with a single pull of the trigger.  **That is**,
> once its trigger is depressed, **the weapon will**
> **automatically continue to fire until the trigger is**
> **released or the ammunition is exhausted**.  Such
> weapons are "machineguns" within the meaning of the
> [National Firearms Act].  [*Id.* at 602 n.1 (emphasis
> added).]

At the pretrial conference, defense counsel requested the trial court to include in

the jury instructions "the definition on fully automatic," as stated in footnote 1 in

Staples vs. United States."  Pret. Tr. 34, ll. 15-18.  Just minutes previously, defense

counsel paraphrased that language, explaining that it "talks about firing until the

trigger is released or until the magazine is emptied." Pretrial Tr. 26, ll. 20-21.  In

justification of his request, counsel told the court that the "language is from Staples

and ... was adopted by the Seventh Circuit in the Fleischli case."[6]  Pretrial Tr. 26, ll. 22-23.  In further support, counsel explained that the firearm at issue here was actually the "same exact model of firearm ... in ... Staples."  *See* Pretrial Tr. 25, ll. 22-23.  Indeed, it was — an AR-15 with certain M-16 parts.  *Compare* Staples, 511 U.S. at 603 *with* Tr. 102, l. 1 – 103, l. 21 (testimony of ATF firearms expert).  The question in both cases concerned whether an AR-15 type rifle was a machine gun.  *Compare* Staples, 511 U.S. at 602 *with* Tr. 112, ll. 8-12 (testimony of ATF firearms expert).

Unpersuaded, the trial court refused Olofson's requested instruction.  Instead, the court instructed the jury, first reciting the elements as they appeared in the indictment:

> The grand jury charges that:  On or about July 13th, 2006, in the State and Eastern District of Wisconsin, David R. Olofson, **knowingly transferred** a **machine gun**.
> The firearm involved in this offense was an Olympic Arms, .223 caliber SGW Rifle, model CAR-AR, bearing serial number F 7079.
> All in violation of Title 18, United States Code, 922(o) and 924(a)(2).  [Tr. 217, ll. 24 – 218, l. 6 (emphasis added), App. B-20.]

Then, the court instructed the jury on the mens rea element of the offense, telling the jury:

---

[6]    United States v. Fleischli, 305 F.3d 643, 655 (7th Cir. 2002) (Relying exclusively upon Staples, the Court ruled that "automatically" element of the machine gun definition was satisfied "[i]f [the firearm], with one application of the trigger, **continued to fire until the trigger was released or the ammunition was exhausted....**" (emphasis added)).

> When the word "knowingly" is used in these instructions,
> it means that the defendant realized what he was doing
> and was aware of the nature of his conduct, and did not
> act through ignorance, mistake or accident. Thus, to
> obtain a conviction, the government must prove that the
> defendant **knew of the features** of the gun that made it
> a **machine gun** as defined by federal law when he
> transferred the gun. [Tr. 219, ll. 16-22 (emphasis added),
> App. B-35.]

In further explanation, the court quoted from the first sentence of section 5845(b),

the statute defining a "machine gun:"

> A machine gun is any weapon which shoots, is designed to
> shoot, or can be readily restored to shoot, **automatically**
> more than one shot, without manual reloading, by a
> single function of the trigger. [Tr. 219, l. 25 – 221, l. 3
> (emphasis added), App. B-36-37.]

Finally, the court summed up the mens rea elements, as follows:

> To sustain the charge of transferring a machine gun, the
> government must prove the following propositions:
>      First, that the defendant knowingly transferred a
> machine gun; and second, that the defendant knew, or
> was aware of, the **essential characteristics** of the
> firearm which **made it a machine gun**. [Tr. 220, ll. 4-9
> (emphasis added), App. B-37.]

Completely missing from these instructions was any language defining

"automatically." Contrary to the teaching of both <u>Staples</u> and <u>Fleischli</u>, the trial

court apparently decided that the jury did not need any further guidance about the

meaning of "automatically," either as a guide to determine whether Olofson's AR-15

was, in fact, a machine gun, or whether Olofson knew it to be one at the time of the

transfer. In so doing, the trial court failed to follow the pattern criminal Federal

Jury Instructions for the Seventh Circuit which requires the Court to provide to the

jury "a list of **all** the characteristics in the ... statutory definition of the particular firearm which is the subject of the prosecution" (emphasis added), citing, *inter alia*, Staples.  Instead, the trial court's instructions sanctioned the prosecution's theory of the case, which also deviated from both Staples and Fleischli, that a weapon that fired, or that could be made to fire, more than one shot on the single pull of a trigger is a machine gun — without regard to whether the trigger was released or the ammunition was exhausted.  See Tr. 188, ll. 22-25.

The trial court's decision to reject the proffered instruction was reversible error under this Court's four-part test set forth in United States v. Edwards, 36 F.3d 639, 645-46 (7th Cir. 1994) and United States v. Fawley, 137 F.3d 458, 468 (7th Cir. 1998):  "(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny [Olofson] a fair trial."

### A. Olofson's Requested Staples Instruction Represents an Accurate Statement of the Law.

Contrary to the prosecutor's personal view that "footnote 1 of Staples ... seems to be inconsistent with the statutory definition of [automatically]" (Pret. Tr. 35, ll 1-10), the ATF issued a ruling in 2004 that the Staples definition and this Court's application of that definition in Fleischli control the legal definition of "automatically."  *See* ATF Rul. 2004-5, p. 1 (Aug. 18, 2004); App. B-54-55.  Designed to settle the definition of a "machine gun" in 26 U.S.C. section 5845(b), the ruling

19

relied primarily upon the definitions of "automatic" as they appear in <u>Fleischli</u> and

<u>Staples</u>.  *Id*.  In further support of the <u>Staples</u>/<u>Fleischli</u> requirement that, to be an

automatic, the firearm must continue to fire "until the trigger is released or the

ammunition is exhausted," the ATF Ruling cites George C. Nonte's <u>Firearms</u>

<u>Encyclopedia</u> (Harper & Row: 1973), which reads:

> any firearm in which a single pull **and continuous pressure upon
> the trigger** ... will produce rapid discharge of successive shots **so long
> as ammunition remains** in the magazine or feed device in other
> words a machinegun.  [*Id*. at 13.]

*See* App. at B-55.  Additionally, this ATF Ruling cites with approval John Quick's

definition in his <u>Dictionary of Weapons and Military Term</u> (McGraw-Hill 1973)

which defines automatic fire as "continuous fire from an automatic gun, lasting

until pressure on the trigger is released."  *Id*. at 40.  *See* App. at B-55.

   Fully consistent with the ATF published definition, Stephen Halbrook's

<u>Firearms Law Deskbook</u> (2008 Edition) states that a gun "does not become a

[machinegun] ... if it will not fire all rounds in a completely loaded magazine with

one constant pull of the trigger." *Id*., § 6:6, p. 440.  In further support of the <u>Staples</u>

definition, Halbrook quotes the definition of automatic that appears in the <u>Glossary</u>

<u>of the Association of Firearm and Toolmark Examiners </u>(1985):

> A firearm design that feeds cartridges, fires and ejects
> cartridge cases **as long as the trigger is fully
> depressed and there are cartridges available in the
> feed system.**  Glossary of the Association of Firearm and
> Toolmark Examiners 2 (1985) *Id*., p. 2 [*quoted in*
> Halbrook's <u>Firearms Law Deskbook</u>, Section 6.6, p. 440
> (emphasis added)].

20

Totally missing from any of these authorities is any definition of "automatic" remotely akin to the one employed by the prosecutor throughout this case,[7] as summarized in his closing argument to the jury:

> [I]n the packet of jury instructions ... there's a definition of "machine gun"....
>
> Under the federal statute ... a machine gun is defined as:  Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.
>
> **That is, if you have a gun, you pull the trigger once and more than one shot is fired, that firearm is a machine gun.**  [Tr. 188, l. 17 – 189, l. 2 (emphasis added)].

The prosecution's definition directly contradicts established law, whereas Olofson's requested jury instruction conforms to all of the leading authorities, including the ATF itself.

## B. Olofson's <u>Staples</u> Instruction Reflects a Theory that Is Supported by the Evidence.

At the pretrial conference, the defense consistently took the position that the AR-15 was not a machine gun, because, when it fired multiple bursts, it did so because of a malfunction.  The issue came up both in relation to the expert testimony that Olofson planned to present (Pretrial Tr. 25, ll. 9-15), as well as in relation to the request for a jury instruction based on <u>Staples</u> and <u>Fleischli</u> to the

---

[7]     *See* Tr. 12, ll. 7-9; Tr. 109, l. 8 – 110, l. 8); Tr. 112, ll. 8-18; Tr. 188, l. 20 –  189, l. 2; Tr. 188, ll. 10-14, 17-21; and Tr. 190, l. 24 – 191, l. 4.

effect that the firearm at issue in this case was malfunctioning as it "jammed" after a multiple round burst, and did not stop firing based upon the trigger being released or the magazine being emptied.  (Pretrial Tr. 26, l. 25 – 27, l. 1.)

At trial, it was the prosecution which first introduced evidence of malfunction. The man who had borrowed Olofson's AR-15 testified that Olofson had told him, Kiernicki, not to put the firearm in the "third position" because it would "malfunction and jam."  Tr. 46, ll. 15.  This is exactly what happened.  Kiernicki disregarded Olofson's instructions, the firearm malfunctioned, jamming after three rounds, even though he had **not** released the trigger or exhausted the ammunition in the AR-15's magazine.  Tr. 46, l. 16 – 47, l. 5.  Next, on cross-examination the government's firearms expert agreed that the rifle exhibited "a malfunction they call hammer follow."  *See* Tr. 122, l. 19 – 123, 1. 2.  Finally, the defense expert witness explained why, in his expert opinion, the AR-15 was a "malfunctioning" firearm.  *See e.g.,* Tr. 166, l. 19 – 167, l. 14; Tr. 176, l. 20 – 177, l. 24.

Accordingly, the record is unequivocal that this case involved a malfunctioning semi-automatic rifle.[8]  Indeed, had the jury been instructed under <u>Staples</u> that, to constitute a machinegun, a firearm must "automatically continue to fire until the trigger is released or the ammunition is exhausted," it would have enabled the defense to argue before the jury that (i) Olofson's rifle was not a machine gun, and

---

[8]    Halbrook's <u>Deskbook</u> explains why the <u>Staples</u> Court clarified the definition of "automatic in such a manner as will greatly assist the defense of 'malfunction' cases."  Halbrook's <u>Deskbook</u>, § 6:6, p. 440.

22

(ii) even if it was later found to be one, at the time of the transfer, he had no

knowledge of any fully automatic capacity of that firearm (*see* Argument II, *infra).*

Instead, the omission from the instructions of the <u>Staples</u> definition facilitated the

prosecutor's theory of the case, and enabled him to close his rebuttal by arguing not

only that the AR-15 was a machine gun, but that Olofson knew that it was:

> [K]eeping in mind the statutory definition of "machine
> gun," that is ... any weapon that will shoot more than one
> round with one pull of the trigger ... is a machine gun....
> Mr. Olofson's ... AR-15 ... clearly fired automatically and,
> therefore, qualified as a machine gun.  And at the time
> that he transferred that machine gun to Mr. Kiernicki,
> Mr. Olofson knew that.  [Tr. 213, l. 21 – 214, l. 12, App. B-
> 37.]

## C. Olofson's Proposed <u>Staples</u> Instruction Reflects a Theory Not Already Part of the Charge.

The trial court did not include in its instructions any defining characteristics

that made a firearm a machine gun.  Rather, the court simply recited the statutory

definition.  *See* Tr. 219, l. 25 – 220, l. 11, App. B-36-37.  But, as the <u>Fleischli</u> Court

pointed out, the statute does not define "automatic."  <u>Fleischli</u>, 305 F.3d at 655.

Further, when "automatically" is used in conjunction with a firearm, as is the case

with 26 U.S.C. section 5845(b), the word takes on a technical meaning, as evidenced

by ATF Ruling 2004-5's reliance on the expert opinion of technical weaponry

publications.  App. B-54-55.  Thus — as the ATF Ruling also confirms — the

definition chosen by the <u>Staples</u> Court conforms to the specialized and authoritative

source materials.

23

According to the prosecution's definition of "automatically," however, <u>Staples</u> was wrong.  Indeed, at the final pretrial conference, the prosecutor was so sure of his definition that, even though he not yet "looked at footnote 1 of Staples," he stated dismissively:

> it ... seems to be inconsistent with the statutory definition which provides that a machine gun is any weapon that shoots more than one shot without manual reloading by a single function of the trigger.  **More than one shot obviously doesn't, on its face at least, require the complete emptying of the cartridge.**  [Pretrial Tr. 35, ll. 1-10 (emphasis added)].

Although the trial court indicated that it would "look at Staples,"[9] and the minutes of the pretrial conference reflect that "[t]he court reserve[d] judgment with regard to the defendant's request to include language from *Staples* - footnote 1,"[10] it appears that the court came to the same conclusion as the prosecution.  Not only did the trial court fail to include the <u>Staples</u>/<u>Fleischli</u> definition in the instructions,[11] but, as revealed in its decision rejecting Olofson's motion for acquittal, the trial court adopted and applied the prosecution's expansive definition of automatic in its review of the sufficiency of the evidence.  *See* Sent. Tr. 10, l. 15 – 11, l. 1; Sent. Tr. 15, ll. 10-16, App. B-38-39.

---

[9]    Pretrial Tr. 35, l. 11.

[10]   Pretrial Minutes, R. 71, p. 2.

[11]   *See* Tr. 219, l. 11 – 220, l. 11, App. B-36-37.

24

Further, during the trial, defense counsel contended that even the government's expert testimony on "hammer follow" supported Olofson's contention that the AR-15's multiple round bursts were caused by a malfunction, and therefore necessitated a jury instruction that tracks the <u>Staples</u> case.  *See* Tr. 151, ll. 16-22.  In response, the prosecution argued that a <u>Staples</u> instruction would "sort of risk confusing the jury on an issue that's not going to be of any significance in the case," because, in his view, "[i]f you pull the trigger once and it fires more than one round, **no matter what the cause** it's a machine gun...."  Tr. 151, l. 9 – 152, l. 1 (emphasis added).  Clearly, the prosecution knew that Olofson's malfunction theory, which was dependent upon the trial court's giving <u>Staples</u> instruction, would jeopardize its effort to obtain a conviction.

Indeed, it appears that the <u>Staples</u> definition deliberately was designed, *inter alia*, to avoid a malfunctioning rifle firing multiple rounds from being classified as a machine gun.  *See* Halbrook's <u>Deskbook</u>, § 6:6, pp. 439-40.  In the <u>Staples</u> trial, the district court had excluded  ATF documents that defendant Staples had claimed established that his AR-15 fired multiple rounds as a consequence of a malfunction, and that ATF "knew about the possibility of malfunction."  *See* <u>United States</u> v. <u>Staples</u>, 971 F.2d 608, 613-14 (10th Cir. 1994).  The court of appeals upheld the trial court's ruling on the ground that such documents "had no tendency to establish any fact of consequence to the determination of the action."  *Id.*, 971 F.2d at 614.  But the lower court's ruling was undermined by the Supreme Court's opinion in

<u>Staples</u> when it construed the statute to require that a defendant know the

essential characteristics that make a particular firearm a machine gun, even

though that requirement was not explicitly included in the statutory language.  *See*

<u>Staples</u>, 511 U.S. at 605 ("The language of the statute ... provides little explicit

guidance in this case.").

As was true in <u>Staples</u>, so it is here.  Without a specific definition of

"automatically" in the instructions, the jury was left with no "explicit guidance" as

to the meaning of the term.

### D. The Failure to Include the Defendant's <u>Staples</u> Instruction Denied Olofson a Fair Trial.

Without the <u>Staples</u> definition of "automatically," the jury instructions enabled

the prosecution to present to the jury — what he had maintained throughout the

trial[12] — his idiosyncratic definition of "automatically," that is, "if you have a gun,

you pull the trigger once and more than one shot is fired, that firearm is a machine

gun."  Tr. 189, ll. 1-2.  In effect, without the <u>Staples</u> definition in the jury

instructions, the prosecution secured a conviction on the basis of a clearly erroneous

definition of one of the essential characteristics of a machinegun, that is, whether

the firearm shoots "automatically."  Moreover, the prosecution secured a conviction

by an interpretation that literally reads "automatically" out of the statute.  After

all, if "automatically" means nothing more than that "a weapon which ... shoots

---

[12]     *See* Tr. 12, ll. 7-9; Tr. 102, ll. 14-19; Tr. 110, ll. 4-8; Tr. 112, ll. 8-18; Tr. 137, l. 15 – 138, l. 6; Tr. 188, l. 20 - 189, l. 2; Tr. 188, ll. 10-14, 17-21; Tr. 190, l. 24 – 191, l. 4.

more than one shot, without manual reloading, by a single function of the trigger," as the prosecution repeatedly argued, there is no need for "automatically" to be a part of the definition.  Not only is such a reading contrary to <u>Staples</u> and <u>Fleischli</u>, but also contrary to the "cardinal principle of statutory construction" that, if possible, it is the duty of the judiciary to give effect to every word of a statute.  *See* <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362, 404 (2000).

By the trial court's rejection of the <u>Staples</u> instruction in favor of using a verbatim quotation from 26 U.S.C. section 5845(b), the prosecution avoided the "risk" of confusion that, in his opinion, a <u>Staples</u> instruction would have created by the defense malfunction theory.  *See* Tr. 151, l. 9 – 152, l. 3.  In the process, however, the statute's independent element of "automatically" was treated as wholly superfluous, and malfunctions deemed irrelevant, leading to an instruction that fell way short of the judicial "duty 'to give effect, if possible, to every ... word'"[13] of 28 U.S.C. section 5845(b) and to ensure Olofson a fair trial.

## II.     As a Matter of Law, the Evidence Was Insufficient to Support a Conviction under 18 U.S.C. Sections 922(o) and 924(a)(2).

"When considering a challenge on direct appeal to the sufficiency of the evidence to sustain a conviction, [this Court] must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

---

[13]     *See* <u>Duncan</u> v. <u>Walker</u>, 533 U.S. 167, 174 (2001).

United States v. Copus, 93 F.3d 269, 271 (7th Cir. 1996) (italics original).  On

January 17, 2008, Olofson filed a motion for acquittal for insufficiency of the

evidence.  R. 73.  On May 13, 2008, the trial judge denied the motion.  Sent. Tr. 21,

ll. 10-14. App. B-46-47.  That ruling was erroneous, having been based upon an

erroneous legal standard on a record "devoid of any evidence, regardless of how it is

weighed, from which a jury could find guilt beyond a reasonable doubt...."  Copus,

93 F.3d at 271.

### A. The Trial Court Applied an Erroneous Legal Standard to the Sufficiency of the Evidence.

"Under the rule in Staples, the government [must] prove that [Olofson] knew

that his weapon had every characteristic of the statutory definition of a firearm,"

herein a machinegun.  See United States v. Meadows, 91 F.3d 851, 856 (7th Cir.

1996) (emphasis added).  Instead, in its assessment of the sufficiency of the evidence

to support a finding that Olofson's AR-15 was an "automatic" weapon within the

meaning of 28 U.S.C. section 5845(b), the court adopted the prosecutor's theory of

the case and weighed the evidence only to determine whether the weapon fired

more than one round at the single pull of the trigger.  Thus, the court found that the

videotaped ATF test of Olofson's AR-15, which showed the weapon firing 20 rounds

with the single pull of the trigger, proved that the AR-15 was a machinegun,

because it "shows the weapon firing multiple times on what appear[s] to have been

a single depression of the trigger."  Sent. Tr. 10, l. 15 – 11, l. 14, App. B-39.

28

Additionally, in its assessment of the sufficiency of the evidence of Olofson's knowledge that the AR-15, in the third selection switch-mode, functioned as an "automatic" weapon, and thus that Olofson supposedly knew, at the time of the transfer, that the AR-15 was a machine gun, the court weighed the evidence only to determine whether Olofson knew that the weapon in that third selector position fired more than one burst at the single pull of the trigger:

> Now Olofson had informed the customer [Kiernicki] that he knew that it was an automatic function. Olofson mentioned to the customer that he had fired the weapon in the three-round burst position and the weapon had jammed on him. There Olofson is stating that he not only operated this rifle in the automatic mode, but had done so prior to turning it over to this customer for firing. [Sent. Tr. 15, ll. 10-16; App. B-42.]

> What was necessary was that the evidence showed [Olofson] knew this was a weapon which could fire multiple times with a single function [of the trigger]. [Sent. Tr. 23, ll. 12-14.]

> [T]he customer [Kiernicki] testified that the weapon malfunctioned, but it malfunctioned with the knowledge of the defendant that it would fire automatically with one function of the trigger, one pull of the trigger, and he loaned it to this customer knowing it operated in that fashion or had the ability to operate in that fashion. [Sent. Tr. 51, ll. 19-24.]

Clearly, the court did not apply the definition of "automatic" as it appears in footnote 1 of the Staples decision, which would have required evidence that at the single pull of the trigger the AR-15 would have had to "continue to fire" multiple bursts at the single pull of the trigger "until the trigger is released or the ammunition is exhausted." Staples, 511 U.S. at 602 n.1.

29

**B. The Record Is Devoid of Any Evidence to Support a Finding that at the Time of the Transfer of the AR-15 Olofson Knew that It Had the Essential Characteristics of a Machine Gun.**

Neither the lay testimony, nor the expert testimony, taken in the most favorable light for the government, established that Olofson's AR-15 was a machinegun according to the <u>Staples</u> definition.  As noted above, Kiernicki, the person to whom Olofson loaned the firearm, testified simply that, at the single pull of the trigger, the AR-15 fired three rounds and then jammed.  Tr. 39, ll. 15-20.  Further, Kiernicki explicitly denied that the rifle stopped firing because he had either released the trigger or exhausted the ammunition in the magazine.  Tr. 46, l. 22 – 47, l. 8.  Under the <u>Staples</u> definition of "automatically," Kiernicki's testimony could not have established that the AR-15 was a machine gun.

The only direct evidence that could possibly have established that the AR-15 fired more than one shot on a single pull of the trigger — and continued to do so unless the trigger was released or the ammunition exhausted — would have been that of Firearms Enforcement Officer Kingery ("FEO Kingery").  At the outset of his testimony, and before he conducted any test, he disclosed that each of the tests would be conducted on the basis of his expert opinion that Olofson's AR-15, as "assembled," would "fire automatically," that is, "fire more than one round with a single pull of the trigger."  *See* Tr. 102, ll. 1-19.  Thus, even though FEO Kingery testified that he that he fired the AR-15 by holding "the trigger down and it emptied all 20 rounds without stoppage," his opinion that the AR-15 was a machinegun was **not** based upon the fact that the weapon continued to fire unless he released the

trigger or the ammunition was exhausted.  Rather, he testified that the AR-15 fired

"automatically" because it fired "more than one round with a single pull of the

trigger," and for that reason alone the AR-15 was a machine gun.  *See* Tr. 109, l. 8 –

110, l. 8.  Further, with regard to the third test which had been videotaped, FEO

Kingery did not even bother to note for the record whether the firearm had fired,

and kept on firing, until the trigger was released or the ammunition exhausted.

Rather, by careful exactness, the prosecution elicited the expert's opinion, as

follows:

> Q. [B]ased on your training and experience and your examinations and
> tests firings of [the AR-15], do you have an opinion as to whether or
> not that firearm is a machine gun?
>
> A.  Yes, it is a machine gun.
>
> Q. [W]hy do you consider that firearm to be a machine gun?
>
> A.  Because it fires automatically.
>
> Q.  And by "automatically" what do you mean?
>
> A.  It fires more than one round without manual reloading by a single
> function of the trigger.  [Tr. 112, ll. 8-18.]

Having deliberately chosen to limit its own expert's opinion to conform to the

prosecution's mistaken understanding of the legal definition of "automatically," as

established in Staples and Fleischli, the prosecution **cannot now reverse course**

and urge this Court to take the government's evidence in any better light than the

government presented it at trial.  See Meadows, 91 F.3d at 857.  Thus, taking the

government's evidence in its most favorable light, the expert testimony did not

measure up to the <u>Staples</u> definition of a machine gun, and the record thus was devoid of any evidence that the AR-15 fired "automatically," while there was clear evidence of malfunction.

Even if the government were permitted on appeal to try to discard the expert's legally erroneous opinion in favor of the raw data about which he testified, none of the ATF firearm tests could possibly be relied upon to establish that **at the time of the July 2006 transfer** Olofson **knew** that the AR-15 would fire more than one shot at the single pull of the trigger without manual loading, and continue to fire, unless the trigger was released or the ammunition was exhausted. The three ATF firearm tests took place three, four and seven months, respectively, **after** the transfer took place.

So to prove that Olofson had the requisite knowledge that the AR-15 had "every characteristic" of a machinegun, the government must go elsewhere. It could not rely on the testimony of Kiernicki, Olofson's transferee, because Kiernicki testified not only that the firearm "jammed" after three shots by a single pull of the trigger, but that he had not released the trigger nor exhausted the ammunition on any of the three or four times when he had placed the AR-15 into the third selection position. *See* Tr. 46, l. 16 – 47, l. 8. Further, Kiernicki testified that Olofson had previously warned him that the gun "doesn't work" in the third position, "that it would jam up." *See* Tr. 38, ll. 13-14. *See also* Tr. 38, ll. 20-21; Tr. 39, ll. 1-6; Tr. 46, ll. 3-19.

32

In direct testimony, Kiernicki stated that, after the police had talked to him about the "automatic" fire at the shooting range, Kiernicki told Olofson about the incident and Olofson said that he had "never had trouble with the police shooting an automatic gun at the Conservation Club in Berlin." *See* Tr. 41. ll. 2-7. Twice on redirect the prosecution confirmed that what Olofson told Kiernicki after the Club incident, that he had "fired automatically at the Conservation Club before and not had any problems." *See* Tr. 55, ll. 13-25; Tr. 56, ll. 1-5, 21-24; Tr. 57, ll. 1-2, 11-13.

Taking this evidence in the most favorable light to the government, one still cannot assume that Olofson was talking about the transferred firearm when he referred to "an automatic gun" or to "fired automatically." Nor can any inference be drawn from Olofson's use of the words "automatic" or "automatically," the meaning assigned to Olofson by that term. He could have meant nothing more than what the prosecution meant when it used the word in its summation to the jury — "[t]hat is, if you have a gun, you pull the trigger once and more than one shot is fired...." *See* Tr. 188, l. 20 – 189, l. 2. And there is nothing in the record to indicate that, at the time of the transfer of the firearm, Olofson understood that "automatic" or "automatically" meant what the Supreme Court said it meant in footnote 1 of its Staples decision. To the contrary, it appears — and the prosecution so argued — that what Olofson meant by "automatically" is that this particular AR-15 "fired in such a way that when he pulled the trigger once more than one round is fired." *See* Tr. 191, l. 14 – 192, l. 5.

33

In short, the record is "void" of any evidence, no matter how weighed, that would allow a rational jury to conclude that the prosecution proved beyond a reasonable doubt that Olofson knew at the time of the transfer of the AR-15 to Kiernicki that it had "every characteristic" of a machine gun, as defined in Staples.  *See* Meadows, 913 F.3d at 856.  Therefore, the trial court erred in denying Olofson's motion for judgment of acquittal based upon the insufficiency of the evidence.


III.   **Without the Staples Interpretative Gloss on the Meaning of "Automatically," Olofson's Conviction under 18 U.S.C. Sections 922(o) and 924(a)(2) Is Invalid, the Statutes Being Void for Vagueness.**

Olofson did not own what would commonly be viewed as a "machine gun" — such as an M-16 or a Thompson Submachine Gun.  Rather, he lawfully purchased an AR-15 type semiautomatic rifle, probably from a federally-licensed dealer (*see* Tr. 66-67).  In his closing argument, however, the prosecutor claimed that Olofson had converted his AR-15 into an M-16 machine gun, because:  (i) Olofson had told the ATF officer who interrogated him on the day of the search of his home that he knew "how to convert an AR-15 into an M-16"; and (ii) the search of Olofson's home had uncovered on Olofson's computer a "conversion manual for converting AR-15's into M-16 machine guns" and "evidence of his ordering M-16 parts." Tr. 193, ll. 1-10. But the search yielded absolutely no evidence of Olofson ordering or possessing any M-16 parts (other than those in the rifle from Olympic Arms), much less the M-16 "auto sear" that ATF Ruling 81-4 states is necessary to convert an AR-15 to a

34

machine gun. *See* Tr. 119, ll. 10-24. Rather, the testimony and Exhibit 12 indicate that Olofson and another individual were only "bartering back and forth over M-16 **associated** items such as **magazines and military pouches,** that type of thing." Tr. 78, ll. 19-24. Moreover, although an ATF agent testified that Olofson told her that he knew how to convert an AR-15 into an M-16, he also told her that "he didn't have the parts, tools, or machining skills" to convert it. Tr. 66, ll. 12-14. While the ATF raid and search of his home produced several guns, gun components, gun parts, and tools for working on firearms, none were identified as related to the conversion of Olofson's rifle into a machine gun. *See* Tr. 70-71.

Yet without record support, the prosecutor prejudicially argued to the jury that "there was evidence on Mr. Olofson's computer ... of his **ordering M-16 parts**.... [T]he replacement of AR-15 parts with **M-16 machine gun parts**, the types of parts **that Mr. Olofson was ordering**. And, with **those** M-16 macine gun parts installed ... that gun fires as an automatic." Tr. 193, ll. 5-10 (emphasis added).

None of the "evidence" referred to in the prosecution's closing argument established that Olofson had converted his AR-15 into a machine gun. Indeed, the government's firearms expert agreed that many AR-15 weapons had been made by the manufacturer of Olofson's AR-15 with many M-16 internal parts. And, although the expert protested that the manufacturer of Olofson's AR-15 "did not use this combination of M-16 machine gun parts," he also confessed that he had never contacted the manufacturer about Olofson's particular rifle. Tr. 118, ll. 12-23. Had the prosecution really wanted to find out if Olofson had converted his AR-15 into a

machine gun, as he contended, he could easily have made an attempt to trace the firearm to its source.  But there was no apparent interest to do so.  Rather, the prosecution was willing to cast aspersions, hoping that the jury would overlook the lack of evidence to show that Olofson's purchase of his AR-15 was no different from that of any other lawful purchaser of a semi-automatic weapon.  As the District Court of the Middle District of Florida observed, "[p]ossessing a semi-automatic rifle purchased lawfully at a sporting store is hardly tantamount to harboring a machine gun.  To punish one as if it were the other is nonsensical and contrary to notions of due process."  *See* United States v. Aguilar-Espinosa, 57 F. Supp.2d 1359, 1368 (M.D. Fl. 1999).

There is nothing criminal about owning an AR-15 rifle — even one which has some M-16 parts, or one which is malfunctioning.  As the Supreme Court observed in Staples, "there is a long tradition of widespread lawful gun ownership by private individuals in this country."  Staples, 511 U.S. at 610.  Because "guns generally can be owned in perfect innocence[,] [loaning] a shot gun or rifle is a simple transaction that would not alert a person to regulation any more than would loaning a car."  Staples, 511 U.S. at 611, 614.  Thus, in light of America's established culture of lawful gun ownership, the Supreme Court concluded that laws restricting or prohibiting the possession of a machine gun must be construed in such a way that "any person who has purchased what he believes to be a semi-automatic rifle or handgun [ought not] be subject to imprisonment [if] ignoran[t] of the gun's firing

capabilities, if the gun turns out to be an **automatic**." *Id.*, 511 U.S. at 615 (emphasis added).

To obtain a conviction below, the prosecution adopted a definition of "automatic" in this case under which **any firearm** that on **any occasion** and for **any reason** either **has shot or could shoot** more than one round at the single pull of the trigger is a machine gun. But that definition of "automatic" is in error, and such use, if permitted here, would make 18 U.S.C. sections 922(o) and 924(a)(2) void for vagueness.

The following brief survey demonstrates how unorthodox the meaning attributed in this case by the prosecution and the trial court to "automatically" actually is. First, their definition of "automatic" is not the ordinary dictionary definition. According to <u>Webster's Third International Dictionary</u> (1962), automatic — when used to describe a firearm — means:

> marked by use of either gas pressure or force of recoil and mechanical spring action for **ejecting** the empty cartridge case after the first shot, **loading** the next cartridge from the magazine, **firing, ejecting** the spent case, and **repeating** the above cycle **as long as the pressure on the trigger is maintained and there is ammunition in the magazine or other loading device.** [Emphasis added.]

Second, as noted above, their definition conflicts with ATF's official position in ATF Ruling 2004-5 (*see* Argument I, *supra*), which itself rests not only on the legal definition set forth in <u>Staples</u> and <u>Fleischli</u>, but definitions of "automatic" in the technical firearms literature as well. *See also* the Glossary of the Association of

Firearm and Toolmark Examiners (1985) 2, reprinted in S. Halbrook, <u>Firearms Law</u> <u>Deskbook</u>, §6:6, p. 440 n.20 (2008 Edition).

Even though these technical definitions are variant, all embrace the necessary existence of an intended continuous fire until an external stopping event — either the release of the trigger **or** the exhaustion of ammunition.  Indeed, that singular feature infuses both the lay and technical understanding of the meaning of automatically, as applied to the section 5845(b) definition of a "machine gun." Thus, as <u>Fleischli</u> points out, the <u>Staples</u> definition is a "commonsense" one. <u>Fleischli</u>, 305 F.3d at 655.  And so it is, because it ensures that possession or transfer of rifles which occasionally have multiple round fires for reasons other than the release of the trigger or the exhaustion of ammunition — such as design failure, manufacturing flaws, broken parts, wear and tear, wrong ammunition, dirt, or other (including Olofson's rifle which could fire "three rounds and jam") — are not criminalized as machine guns.

Even the ATF recognizes the commonsense of the <u>Staples</u> definition in its official <u>Guide to Investigating Illegal Firearms Trafficking</u> (October 1997), in which it defines "automatic" or "fully automatic," to mean:

> An autoloading action that will fire a succession of cartridges, **so long as the trigger is depressed, or until the ammunition supply is exhausted.** Automatic weapons are machineguns subject to the provisions of the National Firearms Act (NFA).  [U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, <u>Guide to Investigating Illegal Firearms Trafficking</u> ("ATF Guide") p. 100 (October 1997) (emphasis added), App. B-52.]

38

According to the Guide's statement of purpose, this definition, along with others, are designed "to promote **uniformity** in the illegal firearms trafficking terminology and the meanings of that terminology (as used by the law enforcement community)." ATF Guide, p. 9, App. B-47 (emphasis added). By giving a more precise meaning to the statutory use of "automatic," the ATF Guide purposes "to provide criminal investigators with a practical instrument to assist their efforts during **preliminary identification** of illegal firearms trafficking indicators and the **thorough investigation** of illegal firearms trafficking violations." *Id.* (emphasis added).

Because the ATF Guide was not followed, this case demonstrates how the statutory prohibition against "trafficking" in machine guns, unaccompanied by the Staples definition of "automatically," encourages arbitrary and discriminatory enforcement. According to the doctrine of void for vagueness, "a penal statute [must] define [a] criminal offense with such sufficient definitiveness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *See* United States v. Collins, 272 F.3d 984, 988 (7th Cir. 2001) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983). 18 U.S.C. sections 922(o) and 924(a)(2) — insofar as they derive the meaning of "machine gun" from 26 U.S.C. section 5845(b) — meet neither test. As the Supreme Court put it in Kolender, "the legislature [must establish] minimal guidelines to govern law enforcement" (Kolender, 461 U.S. at 358):

39

> Where the legislature fails to provide such minimal
> guidelines, a criminal statute may permit a 'standardless
> sweep' [that] allows policemen, prosecutors, and juries to
> pursue their **personal predilections**."  [Kolender, 461
> U.S. at 358 (emphasis added.].

And that is exactly what happened in this case.  Even before he read Staples, the prosecutor claimed that his definition of "automatically" was more consistent with the statute than the Supreme Court's.  Pretrial Tr. 34, l. 23 – 35, l. 10.  Even after reading Staples, he opposed the Staples instruction, saying that it would "risk confusing the jury on an issue that's not going to be of any significance in the case." Tr. 151, l. 16 – 152, l. 3.  Contrary to the prosecutor's personal opinion, if Staples' narrowing construction of the term "automatically" is not engrossed upon 26 U.S.C. section 5845(b), then there will be continuing confusion in the general populace about the essential characteristics of a machinegun in violation of the due process requirement that a criminal statute give "fair warning" of the prohibited conduct. *See generally* Bouie v. City of Columbia, 378 U.S. 347, 350-52 (1964).


**IV.    The Court Erroneously Excluded the Defense Firearms Expert from Trial During the Testimony of the Prosecution's Firearms Expert.**

   **A. Expert Testimony Was Essential to Aid the Jury in Determining whether Olofson's rifle Was a "Machinegun" under 26 U.S.C. section 5845(d).**

The government's entire case depended on proving that the AR-15 rifle owned by Olfson was a "machinegun" (as that term is defined in 26 U.S.C. section 5845(b)), and that the defendant knew it when he loaned the rifle to Kiernicki.  The

components and characteristics which can transform a legal, semi-automatic AR-15 rifle such as that owned by Olofson into a machine gun have been addressed by ATF in a variety of technical rulings, letters, and publications. *See, e.g.*, ATF Rul. 81-4, AATFQB 1981-3 78 (discussed at Tr. 119, ll. 10-16).

As demonstrated in sections II and III, *supra*, firearms classification is not a matter of common knowledge, and especially in this case, requires a general technical understanding of: (i) how semi-automatic rifles and machineguns are built, operate, and can malfunction; (ii) how ammunition can cause or contribute to firearm malfunction; and (iii) the internal and external components of the rifle being classified. As a result, neither the prosecution nor the defense could have competently litigated this case without firearms experts. The government's firearms expert was **FEO Max Kingery** (Tr. 96-140). Defendant Olofson's defense firearms expert was his only witness, **Len Savage** (Tr. 144-179), a federally-licensed firearms manufacturer and an experienced firearms designer/developer (Tr. 145, ll. 3-18).

## B. The Prosecutor and Defense Counsel Agreed Not to Sequester Witnesses, including Experts, but the Prosecutor Reneged.

On the morning of trial, January 7, 2008, the prosecutor and defense counsel expressly agreed to "allow our witnesses in through the entire trial." Tr. 91, ll. 5-6. When the court questioned counsel "at side bar" about the rule on witnesses, it was so advised. Tr. 93, ll. 15-16. 4-9; 91, ll. 6-8. In accordance with this agreement, defense expert Savage sat through the testimony of four prosecution witnesses. Tr.

90, l. 17.  Immediately before the government expert was called to testify, however, the prosecutor informed defense counsel that "he would like to sequester [the defense] expert during [the government] expert's testimony...."  Tr. 90, ll. 10-13.

The prosecutor contended that if the defense expert were not excluded, he would "weave his testimony in through what he heard our witness testify to...."  Tr. 90, ll. 19-20.  In response, defense counsel argued not only that the prosecution should be held to its word, but also that "under Rule 703 it's clear that an expert can testify to factual data ... that are just made known to the expert [the] day [of] the hearing."  Tr. 91, ll. 10-13.  Thus, defense counsel argued that the defense expert should be allowed to be present "so he can hear what [the government's expert] testifies to regarding ... malfunctions so that if the information concerning those malfunctions is ... not complete or incorrect, we have the ability to either rebut or add information to that."  Tr. 91, l. 23 – 92, l. 2.

Despite the court's knowledge that the prosecutor was in obvious breach of his prior agreement, having previously characterized the prosecutor as having "duped the defense" (Tr. 92, l. 13) — and without stating any reason whatsoever for its decision — the court granted the prosecutor's request.  Tr. 95, ll. 7-9, App. B-35-36.  For the reasons set out below, the exclusion of the defense expert was an abuse of discretion by the trial court and constituted prejudicial error.

## C. The Court's Order Excluding the Defense's Expert from Trial during the Testimony of the Government's Expert Witness Was Prejudicial.

As a direct consequence of the court's exclusion order, defense expert Savage was severely limited in his access to information about the Olofson rifle and ATF's theory as to why it was a machinegun, which effectively forced Mr. Savage to base his testimony on the following limited information:

(i) review of the ATF expert reports of October 20, 2006 and November 20, 2006 (Tr. 171, ll. 14-15;179, ll. 5-8);

(ii) a brief "systems check" of the firearm — on the day of trial that he testified — during which he was instructed not to touch the rifle (Tr. 166, ll. 8-18); and

(iii) a viewing of the short excerpt of the February 25, 2007 video of the firing of the rifle that was shown to the jury — at trial (Tr. 176, ll. 15-19).

Moreover, to the defendant's extreme prejudice, defense counsel was denied the important opportunity to consult with his expert with respect to cross-examination of FEO Kingery. *See, e.g.*, Malek v. Federal Insurance Co., 994 F.2d 49, 53-54 (2d Cir. 1993) (exclusion of expert, in conjunction with other trial errors, caused prejudice where other avenues of cross-examination could have been pursued had the expert been present to give advice).

### 1. The Trial Court Abused Its Discretion in Excluding Defendant's Expert from the Courtroom.

Rule 703, F.R.Evid., clearly anticipates that an expert witness will be permitted to be present in court to hear testimony, and then base his expert opinion on that testimony:

43

> The facts or data in the particular case upon which an **expert bases an opinion** or inference may be those perceived by or **made known** to the expert **at** or before **the hearing**.

In explanation of this rule, this Court has stated:

> Rule 703 of the Federal Rules of Evidence specifically states that an expert can base his opinion on the facts and data learned from attending the trial and listening to testimony....  [T]here is little difference between counsel disclosing prior testimony to an expert and having an expert listen to such testimony in the courtroom.  [United States v. Crabtree, 979 F.2d 1261 (7th Cir., 1992), cert. denied, 510 U.S. 878 (1993).]

Thus, the policy underlying exclusion of fact witnesses does not apply with full force to expert witnesses.  "As experts they would be testifying solely as to their opinion based on the facts or data of the case, and, accordingly, were properly exempted from the exclusion of witness order....  Because the experts were "not witnesses whose recollections might have been colored by accounts of prior witnesses, there was no prejudice."  Mayo v. Tri-Bell Industries, Inc., 787 F.2d 1007, 1013 (5th Cir. 1986).  Hence, the trial court should have rejected the prosecutor's feeble attempt to justify exclusion on the ground that the defense expert would tailor testimony around the government's expert.  Tr. 90, ll. 18-20.  Indeed, the court should have recognized the prosecutor's about-face as a tactic to "sandbag" the defense, as the only really plausible reason for his "change of heart."  Tr. 93, ll 7-20.  After all, at the Pretrial Conference, the prosecution well-knew that the defense expert had severely limited opportunities to acquire information on which to base his testimony:  (i) he "has never seen this specific firearm" (Pretrial Tr. 23, ll. 18-19);

44

(ii) he had not been present at any AFT test of the firearm (Pretrial Tr. 23, ll. 18-20); and (iii) he had not even seen the prosecution's video (Pretrial Tr., p. 23, ll. 20-22).[14] With his request to exclude the defense expert so as to prevent him from basing his testimony on the descriptions of the firearm and tests by the government's expert, the prosecution was doggedly determined — even to the point of breaking his word — to deprive the defense expert of any opportunity to base his testimony on what he heard from the government expert's mouth.

Rule 615, F.R.Evid., does not authorize the exclusion of "(3) a person whose presence is shown by a party to be essential to the presentation of the party's cause...." To prevent the exclusion of an expert witness under Rule 615(3), the rule requires only that the party requesting the exception make "a fair showing" that the expert witness is in fact required for the management of the case. United States v. Seschillie, 310 F.3d 1208, 1213 (9th Cir. 2002) (finding an abuse of discretion in excluding a criminal defense expert from the courtroom). Defense counsel did make such a showing, explaining the critical importance of the expert — the only defense witness at trial (Tr. 179, ll. 14-15) — to the defendant's case that the AR-15, when placed in the third position, malfunctioned. See Tr. 90-94, App. B-31-34. The issues swirling around that matter were highly technical and mandated the defense expert's presence during the government expert's critical testimony.

---

[14]   When the defense expert was finally allowed to see the weapon at the trial, he was allowed only a brief time for examination and told that he could not touch it. Tr. 166, l. 12; Tr. 171, l. 4.

45

**2. By the Court's Ruling, Defense Counsel Was Precluded from Obtaining Technical Assistance in Cross-Examination of FEO Kingery, as well as the Full Benefit of Defense Expert's Rebuttal Testimony.**

It is the **government's burden to demonstrate** that **no prejudice** resulted

from the misapplication of Rule 615, F.R.Evid.  *See* Seschillie, 310 F.3d at 1214-15.

And it cannot carry that burden because the exclusion of defendent's expert clearly

made it difficult to examine or rebut the government's witness, as demonstrated by

the following overview:

**a. Achieving Automatic Fire with Soft-Primered Ammunition.**

Because FEO Kingery originally found Olofson's AR-15 **not to be a machine gun**

(Tr. 124, l. 24 – 125, l.1), the prosecution faced an enormous problem in proving

beyond a reasonable doubt that it was.  Only by using **different ammunition** in

retesting the rifle could FEO Kingery reach the opposite conclusion.  Tr. 110, ll. 7-8.

Obviously, the **critical difference** between the two tests was the **ammunition**

**used** in the tests.  FEO Kingery's written report on the second test described the

ammunition as **soft primer** ammunition.  *See* Tr. 127, ll. 1-9.  However, at trial, he

reversed positions, calling his written report a "**misspeaking**" (Tr. 127, l. 4

(emphasis added)) and said the particular types of "standard commercial civilian

ammunition" he used in the second test were "not soft primers."  Tr. 127, ll. 5-6.

But he admitted that the primers on ammunition he used — though not "soft" —

were "**softer** than military primers."  Tr. 127, ll. 4-9 (emphasis added).  Without

defense expert assistance, defense counsel's ability to cross-examine FEO Kingery's

reversal and contradictory statements about the nature and significance of the difference in the ammunition he used and about the his view of three types of primers — "soft," "softer than military," and "hard" — was undermined.

**b. Erroneous Statement regarding "Free floating firing pin."** FEO Kingery was allowed to offer, without challenge, misleading technical testimony about a rifle component called a "free floating firing pin," contending that "military designed firearms have what's called a free floating firing pin" (Tr. 107, ll. 12-25), and thus attempting to distinguish M-16's which need hard primer ammunition from civilian rifles such as Olofson's AR-15 type rifle, which he clearly implied had no "free floating firing pin" and therefore should have not needed such primers. However, **both** the M-16 (recognized by the ATF to be a machine gun) and an AR-15 (recognized by the ATF not to be a machine gun) **have free floating firing pins**. Long, D., <u>AR-15/M16: A Practical Guide</u>, Paladin Press (1985), pp. 55. Defense expert Savage would have known this fact, and its significance, and defense counsel could have used that expertise to challenge FEO Kingery on that point.

**c. Failure to Properly Check the Rifle in the Second Test.** FEO Kingery's second test of the rifle did not follow the same protocol as the first test. Mr. Kingrey checked the rifle in the "safe" position and in the "unmarked third position," but not in the "fire" position, as he had during the first test. Tr. 108, l. 22 – 109, l. 10. On cross-examination, FEO Kingery was asked why he failed to perform a complete test, and he answered that he already knew that it "would function" (*i.e.,* fire) in the

fire position.  Tr. 108, l. 25.  Although defense counsel asked a few questions, he

appeared to be diverted by FEO Kingery's technical discussion of "hammer follow,"

which could have been avoided by access to expert assistance.[15]

In conclusion, defense expert Savage's exclusion from the courtroom allowed

FEO Kingery to testify without effective challenge on highly-technical matters.

Whether intended or not, government counsel's reneging on his word had the effect

of "sand-bagging" and "dup[ing]" defense counsel, and the trial court's order

excluding the defense expert prejudicially impaired the defense counsel's ability to

cross-examine effectively and to elicit rebuttal testimony from the defense expert.

## V.     The District Court Committed Prejudicial Error In Denying Defendant's Discovery Requests.

Prior to trial, pursuant to Rule 16, F.R.Cr.P., Brady v. Maryland, 373 U.S. 83

(1963), and the Due Process Clause of the Fifth Amendment, defendant filed a

motion to compel discovery of documents that had been requested from, but refused

by, the government.  Defendant filed eight specific requests for disclosure of

documents and papers necessary for defense preparation (four of which were

---

[15]     Had FEO Kingery retested the weapon properly, by checking the "fire" position, he might have discovered the soft/softer primered ammunition had also caused multiple round fire in that position as well.  Of course, since there was no evidence that multiple round fire ever occurred before with the rifle in the "fire" position, such a finding would have demonstrated that either (i) the ammunition primers used in the second test were softer than those used by Olofson, or (ii) the rifle somehow had changed while in ATF custody.

48

withdrawn at the Final Pretrial Conference on January 3, 2008).  On the first day of

trial, however, the district court denied the remaining four requests (Tr. 4-6):

- Request No. 2 called for the testing procedures used in the testing and
  examination of defendant's firearm;

- Request No. 4 called for all ATF correspondence to and from the
  manufacturer of defendant's rifle, SGW/Olympic Arms, regarding the use of
  M-16 triggers, hammers, disconnectors, and safety selector in AR-15 type
  firearms between the dates of 1980 and 1990 [the date of the manufacture of
  defendant's rifle];

- Request No. 5 called for all documents relating to the removal, correction, or
  update of any AR-15 type rifles with M-16 components from the NFRTR
  (NFA registry), the central registry of NFA firearms maintained by ATF,
  from 1986 to 2008; and

- Request No. 6 called for documents relating to the refusal by ATF to accept
  any AR-15 type firearm with M-16 components for registration in the
  NFRTR.

The prosecutor refused to produce a single document, on the ground that the

government possessed no exculpatory material.  The prosecutor also argued that

Request No. 4 — the letter from ATF to SGW/Olympic Arms — also implicated 26

U.S.C. section 6103, prohibiting disclosure of certain tax returns and tax return

information.  Tr. 1, l. 21– 3, l. 9.  The prosecution's refusal to produce the

documents requested by defendant was unjustified, and the court abused its

discretion in not requiring the prosecution to produce what had been requested.

Defendant's Request No. 2 called for disclosure of internal procedures for

examining, test firing and classifying AR-15 type semi-automatic rifles which were

in effect at ATF's Firearms Technology Branch during the period from October 20,

2006 through November 20, 2006, the dates of the inconsistent ATF tests on the

defendant's AR-15 rifle by the ATF.  Even if ATF procedures allow an investigator

to request a second testing in a criminal case, the validity of the specific tests

conducted cannot be examined without disclosure of the laboratory standards and

internal procedures that should have been applied.  Failure to follow those

procedures by changing the type of ammunition in the second test could

demonstrate that the tests had been manipulated to arrive at a reversal of the

results of the first test.

With respect to Request No. 4, defense counsel argued that ATF's recall of AR-

15s with M-16 parts by SGW/Olympic Arms was based upon a malfunction, a theory

at odds with the government's contention that it was the presence of internal M-16

parts which made Olofson's rifle a machine gun.  The recall correspondence was

clearly exculpatory and also was discoverable under Rule 16, F.R.Cr.P.  *See* Tr. 4,

l. 19 – 5, l. 8.[16]  Nevertheless, the trial court, without analysis and **without even**

**looking at the document *in camera***[17], denied the motion on the theory that the

information requested was not exculpatory, and that there was no reason to

---

[16]     Obviously, without seeing the document, it was impossible for the
court (and defense counsel) to assess the prosecution's claim about possible
restrictions based upon section 6103, but surely, even if the document contained tax
return information, and even if the disclosure of certain information in that
document were somehow restricted, such information could have been appropriately
redacted to allow disclosure.  In fact, however, there was no determination by the
trial court that section 6103 even applied.

[17]     Not until the sentencing hearing did the trial judge finally look at the
correspondence *in camera* and, stating that he did not consider it exculpatory
material that had to be given to defendant, placed it in the record under seal, as
Exhibit 14.  Sent. Tr. 5-8 (May 13, 2008).  *See* App. B-38-46.

50

challenge the government's claim "that there is tax information."  Tr. 6, ll. 2-23, App. B-29-30.

Request Nos. 5 and 6 sought material about AR-15 rifles with M-16 parts that obviously would be exculpatory, since such information could be used to refute FEO Kingrey's testimony (Tr. 102-03) that the M-16 parts in Olofson's rifle effectively made it a machine gun.

Trial court errors on discovery issues justify a new trial if there has been an abuse of discretion resulting in prejudice.  *See* United States v. Salerno, 108 F.3d 730, 743 (7th Cir. 1997) (quoting United States v. Alvarez, 987 F.2d 77, 85 (1st Cir. 1993)).  *See also* United States v. Miller, 199 F.3d 416, 421 n. 3 (7th Cir. 1999).  In this context, prejudice means a showing that because of the absence of the sought-after evidence, defendant ... did not "receive a fair trial resulting in a verdict worthy of confidence." United States v. Asher, 178 F.3d 486, 496 (7th Cir. 1999) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  *See also* Pickens v. Runyon, 128 F.3d 1151, 1155 (7th Cir. 1997).  Prejudice may exist where, as here, the defendant lacks an adequate opportunity to prepare a defense, or when the error appears to have influenced the jury, and reversal is appropriate where the appellate court lacks a "fair assurance" that the outcome of a trial was not affected by evidentiary error. *See* Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

51

## CONCLUSION

For the reasons stated in Parts II and III, the case should be reversed with instructions to enter a verdict of not guilty, and dismissal of the indictment. For the reasons stated in Parts I, IV, and V, the case should be reversed and remanded for a new trial.

Respectfully submitted,

ROBERT E. SANDERS
  MARK BARNES & ASSOCIATES
  1350 I Street, N.W., Suite 1255
  Washington, DC 20005
  (202) 408-5030

_____

HERBERT W. TITUS*
WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C
  8180 Greensboro Drive, Suite 1070
  McLean, VA  22102-3860
  (703) 356-5070

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.  That the foregoing Brief of Appellant complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 13,861 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as the requirements of  Seventh Circuit Rule 32(b), because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 13.0.0.565 in 12-point Century Schoolbook.


_____
William J. Olson
Attorney for Appellant

Dated: August 25, 2008

**APPENDIX A**

## CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 30(d)

IT IS HEREBY CERTIFIED:

1.  That the appendices (Appendix A and Appendix B) to the Brief of Appellant comply with the requirements of Seventh Circuit Rule 30(a) and (b) listing the required contents of appendices.

2.  That, in addition to hard copy, Appendix A (bound with the Brief of Appellant) and Appendix B (separately bound) have been furnished digitally with the Brief of Appellant to the Clerk of Court and to counsel for the appellee, except for appendix documents not available in a non-scanned pdf format.


_____
William J. Olson
Attorney for Appellant

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief of Appellant,

including Appendix A (bound with the Brief of Appellant) and Appendix B

(separately bound), was made, this 25th day of August, 2008, to the Clerk of Court,

electronically, and by FedEx overnight delivery, and to appellee by e-mail to

greg.haanstad@usdoj.gov and by submitting sufficient hard copies thereof by FedEx

overnight delivery, addressed to counsel for the appellee as follows:

    Gregory J. Haanstad, Esquire.
    U.S. Department of Justice (ED-WI)
    Office of the U.S. Attorney
    517 E Wisconsin Ave, Room 530
    Milwaukee, WI  53202

                                       _____
                                       William J. Olson
                                       Attorney for Appellant