IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 08-2294

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAVID R. OLOFSON,

Defendant-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

THE HONORABLE CHARLES N. CLEVERT
UNITED STATES DISTRICT JUDGE, PRESIDING

Case No. 06-CR-320
_____

BRIEF OF PLAINTIFF-APPELLEE
_____

STEVEN M. BISKUPIC
United States Attorney

GREGORY J. HAANSTAD
Assistant United States Attorney

Attorneys for Plaintiff-Appellee

530 United States Courthouse
517 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-1700

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    Because it is not a correct statement of the law, the district court did not err when it declined to instruct the jury that a weapon is a machinegun only if, with a single function of the trigger, it continues to fire until the trigger is released or the ammunition is exhausted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    II.    The district court did not err in denying Olofson's motion for a judgment of acquittal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    III.    Sections 922(*o*) and 924(a)(2) are not unconstitutionally vague as applied to Olofson's conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    IV.    The district court did not abuse its discretion when it excluded the defendant's expert during the testimony of the government's expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    V.    Olofson has not established that the government failed to disclose material, exculpatory evidence in violation of *Brady*. . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF COMPLIANCE AND  SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . 42

# TABLE OF AUTHORITIES

<u>Page</u>

<u>CASES</u>

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . 12, 18, 19, 21, 23, 24, 27, 28

*Bryan v. United States*, 524 U.S. 184 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Chicago v. Morales*, 527 U.S. 41 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Maynard v. Cartwright*, 486 U.S. 356 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625 (4th Cir. 1996).. . . . . . . . . . . . . . . . . . 31

*Staples v. United States*, 511 U.S. 600 (1994). . . . . . 12, 13, 18, 19, 20, 21, 23, 24, 27, 28

*Strickler v. Greene*, 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Agurs*, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Bagley*, 473 U.S. 667 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Brown*, 328 F.3d 352 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Charles*, 456 F.3d 249 (1st Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Choiniere*, 517 F.3d 967 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Crabtree*, 979 F.2d 1261 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Curtis*, 324 F.3d 501 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 23, 24

iii

*United States v. Edwards*, 526 F.3d 747 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Fleischli*, 305 F.3d 643 (7th Cir. 2002).12, 13, 18, 19, 20, 21, 23, 24, 27, 28

*United States v. Gammon*, 961 F.2d 103 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Gougis*, 432 F.3d 735 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Graham*, 315 F.3d 777 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Green*, 324 F.3d 375 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 29, 30

*United States v. Jackson*, 60 F.3d 128 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Lim*, 444 F.3d 910 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. One TRW, Model M14, 7.62 Caliver Rifle*
    441 F.3d 416 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Powell*, 423 U.S. 87 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Spencer*, 439 F.3d 905 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Suggs*, 374 F.3d 508 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Williams*, 136 F.3d 1166 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . 29

<u>STATUTES</u>

Title 18, United States Code, Section 921. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Title 18, United States Code, Section 922. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Title 18, United States Code, Section 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Title 18, United States Code, Section 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 37

Title 26, United States Code, Section 5845 . . . . . . . . . . . 12, 16, 20, 21, 27, 28, 29, 37

Title 28, United States Code, Section 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## OTHER AUTHORITIES

David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585 (1986/1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Eleventh Circuit Pattern Jury Instructions - Criminal (2003)
        Instruction 34.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Federal Rule of Appellate Procedure 4(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Federal Rule of Evidence 615. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1999). . . . . . . . . . . . . . . . . . . . 37

*The Random House Dictionary of the English Language* (2nd ed. 1987). . . . . . . . . . . . 23

*Webster's Third International Dictionary* (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## JURISDICTIONAL STATEMENT

The government provides the following jurisdictional statement pursuant to Circuit Rule 28(b) because the defendant's jurisdictional statement is not complete and correct.  The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and the underlying criminal statutes, 18 U.S.C. §§ 922(*o*) and 924(a)(2).  The district court's judgment was entered on the docket on May 16, 2008.  The defendant filed a timely notice of appeal on May 18, 2008.

This Court has appellate jurisdiction over this matter pursuant to 28 U.S.C. § 1291, and Rule 4(b) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

I.    Whether the district court correctly refused to give Olofson's proposed jury instruction on the definition of a machinegun, when the definition was not consistent with the plain language of the statute and its purpose.

II.   Whether the district court erred in denying Olofson's motion for a judgment of acquittal.

III.  Whether Sections 922*(o)* and 924(a)(2) are unconstitutionally vague as applied to Olofson's conduct.

IV.   The district court did not abuse its discretion when it excluded the defendant's expert during the testimony of the government's expert.

V.    Whether Olofson has established that the government failed to disclose material, exculpatory evidence in violation of *Brady*.

## STATEMENT OF THE CASE

On December 5, 2006, a grand jury in the Eastern District of Wisconsin returned a one-count indictment charging the defendant, David R. Olofson, with transferring a machinegun, in violation of 18 U.S.C. §§ 922*(o)* and 924(a)(2).  R. 9.[1] Olofson was arraigned on December 6, 2006, and a jury trial was scheduled to commence on February 13, 2007, before United States District Judge J.P. Stadtmueller.  R. 10.  That trial date was adjourned, and Judge Stadtmueller ultimately issued an order discharging Olofson's attorney from the case, as well as an order that the case be assigned to another United States District Judge.  R. 38.

The case was reassigned to the Honorable Charles N. Clevert.  On January 8, 2008, Olofson was convicted following a two-day jury trial.  R. 70.

On May 13, 2008, the district court sentenced Olofson to 30 months in prison, two years of supervised release, and a $100 special assessment.  R. 95.

The judgment was entered on the district court's docket on May 16, 2008.  R. 97.  Olofson filed a timely notice of appeal on May 18, 2008.  R. 99.

---

[1] In this brief, "R." followed by a number refers to an entry on the district court's docket; "Tr." followed by a number refers to a page of the trial transcript; "Sent. Tr." followed by a number refers to a page of the sentencing transcript; and "Def. App." followed by a number refers to the defendant's appendix.

## STATEMENT OF FACTS

A.     Offense conduct

Olofson frequently provided weapons and ammunition to other people; in fact, he told law enforcement agents that he had provided so many guns to different people that he could not keep track.  Tr. 64.  He couldn't remember who had his guns, and he said that he didn't maintain any record of who had his guns because that would be too dangerous.  Tr. 64.

In the Spring of 2006, attempting to sell a Colt AR-15 rifle, Olofson posted an advertisement in a restaurant near New Berlin, Wisconsin. Tr. Robert Kiernicki saw the advertisement and contacted Olofson about buying the rifle.  Olofson told Kiernicki that he already had sold the rifle, but that he could get another one for Kiernicki.  Olofson offered to order to order an AR-15 kit for Kiernicki, and to put the rifle together for Kiernicki once the kit arrived.  Tr. 33-41.

While waiting for the kit to arrive, Olofson loaned another AR-15 to Kiernicki.  Tr. 35.  Olofson later told an agent from the Bureau of Alcohol, Tobacco, and Firearms (ATF) that he loaned the AR-15 to Kiernicki because it was important for Kiernicki to maintain his firearms skills.  Tr. 63.

Olofson loaned his gun to Kiernicki on four separate occasions.  On each occasion, Kiernicki would keep the gun for approximately two weeks.  Olofson also

gave Kiernicki free ammunition each time that he loaned him the gun. Olofson gave Kiernicki a total of approximately 800 rounds of ammunition, including 500 rounds on July 13, 2006. Tr. 33-41.

On one of the occasions during which he had Olofson's gun, Kiernicki noticed that the gun's selector switch moved not only into positions marked "safe" and "fire," but also could be placed in an unmarked third position. When Kiernicki asked him about the unmarked selector position, Olofson acknowledged that it was an automatic setting. Olofson said that he had fired the gun with the selector in that position and that, when he had, the gun fired multiple rounds with a single pull of the trigger and then jammed. Tr. 33-41.

On July 13, 2006, Kiernicki was at a conservation club in Berlin. Tr. 33. He was shooting the gun in semiautomatic mode – that is, with the selector switch turned to the "fire" position, and firing a single shot with each pull of the trigger. Kiernicki fired approximately 100 to 120 rounds in semiautomatic mode before placing the selector switch in the unmarked third position. Tr. 35. With the selector in that position, Olofson's gun fired three to four rounds with a single pull of the trigger, and then jammed. Tr. 37. Kiernicki cleared the jam and again fired Olofson's gun in a burst of three to four rounds with a single pull of the trigger. Tr. 36.

That day, local police received a telephone call from someone who reported hearing automatic gun fire at the conservation club. The officers responded to the club and encountered Kiernicki and two other individuals. When the officers told Kiernicki that someone had called about automatic gunfire, Kiernicki acknowledged that he had fired Olofson's gun in fully automatic mode. Tr. 44. The officers looked at and took down the serial numbers for the three guns that Kiernicki and his friends had at the club. Tr. 45. The officers left the club without taking any of the guns with them. Tr. 46.

A Berlin Police Officer eventually took Olofson's gun from Kiernicki and contacted ATF. After, Kiernicki called Olofson to tell him what had happened at the conservation club. When Kiernicki told Olofson that he had been firing Olofson's gun in automatic mode, and that the police had responded to a complaint of automatic fire, Olofson responded that he – Olofson – had fired guns in fully automatic mode at the conservation club and never had any problems. Tr. 51.

The Berlin Police Department turned Olofson's gun over to ATF. On June 16, 2006, federal agents executed a search warrant at Olofson's residence. While the search was taking place, Olofson consented to an interview with an ATF agent. Olofson acknowledged that he had loaned the gun to Kiernicki, but denied knowing that it fired automatically. Tr. 61-64.

Olofson acknowledged during his interview that agents would find firearms in his residence.  Tr. 64.  He also said that he had caches of weapons, but he would not tell the agent where they were.  Tr. 65.

Olofson also told the agent that he knew what a machinegun was.  Tr. 65.  When asked to elaborate, Olofson said that a machinegun was a firearm that would expel more than one round with a single pull of the trigger.  Tr. 65.  Olofson said that he knew how to convert a nonautomatic rifle into a machinegun.  Tr. 65.

During the search of Olofson's residence, agents found a number of things, including more than a dozen guns; gun components and parts; firearms tools; firearms manuals; and ammunition.  Agents also found computers that contained a number of machinegun-related documents.  For example, on one computer was an electronic manual entitled "AR-15 to M-16 Conversion Book."  The manual described a number of ways in which an AR-15 could be converted into an automatic M-16 machinegun.  One of the conversions that was described in the manual required removing specific AR-15 components – the bolt carrier, the hammer, the trigger, the selector, and the disconnector – and replacing them with M-16 parts.  Another manual on Olofson's computer described how to convert a semiautomatic SKS rifle into a fully automatic SKS rifle.  Tr. 61-65.

There were a number of e-mails on Olofson's computers.  In one e-mail Olofson and another individual discussed the possible exchange of M-16 magazines and parts.  In another e-mail, someone asked Olofson about the untaxed registering of a machinegun.  Olofson responded:

> MGs are just the small toys one can get.  Remember, as a sovereign you are unhindered by the regulations that the federal citizens have to follow.  There is a separate set of paperwork dealers must fill out to cover their butts on where the weapons and other items went.  That is what a sovereign alien I.D. number does for him.  It's just a way of accounting for where it went.  Yes, you can build any weapon you like.  You can learn more, especially details on the paperwork.  You should learn more about sovereignty first.  After some basic knowledge we will walk you through everything the first time to help you get the hang of it.  Finding real freedom for the first time is like a baby's first step.  You haven't really done it before so you don't know what it's like.  But we can change that.  Then you can literally do most anything you want so long as it interferes with no other's rights or person.  Near Wisconsin by Chance?

Tr. 61-64; Sent. Tr. 18.

B.    Discovery request

On December 28, 2007, shortly before trial was to commence, Olofson filed a motion to compel the government to disclose several categories of material.  R. 65.  At the final pretrial conference held on January 3, 2008, Olofson withdrew some of the requests.  R. 71.  The requests that remained related to ATF testing procedures, and documents relating to the existence of M-16 components installed in AR-15 rifles.

8

Before the start of trial, the government determined that there was one document that was responsive to Olofson's request for "[a]ll ATF correspondence to and from SGW and Olympic Arms regarding the use of M-16 triggers, hammers, disconnectors and safety selectors in AR-15 type firearms, specifically between 1980 and 1990.  Tr. 2-4. That document became the focus of Olofson's continuing request for *Brady* material.  *See, e.g.*, Tr. 4-6; R. 82; Sent. Tr. 3-8.

On the morning of trial, the district court concluded that Olofson had not established that the information he sought was exculpatory.  Tr. 6.  Olofson addressed the issue again after trial, and the district court again concluded that Olofson had not established that the material was exculpatory.  Sent. Tr. 2-8.  This latter conclusion was after the district court's *in camera* inspection of the document. Sent. Tr. 7-8.

C.     Olofson's requested jury instruction

Among the instructions that the government asked the district court to provide to the jury were the standard instructions for the elements of the offense of transferring a machinegun.  R. 66.  Consistent with the relevant statutes and patter jury instructions, the district court instructed the jury:

> A machine gun is any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

To sustain the charge of transferring a machine gun, the government must prove the following propositions:

First, that the defendant knowingly transferred a machine gun; and second, that the defendant knew, or was aware of, the essential characteristics of the firearm which made it a machine gun.

Tr. 219-20.

The district court refused to provide an instruction from Olofson that would have required the government to establish not only that a weapon "shoot more than one shot, without manual reloading, by a single function of the trigger," but also that the weapon continue to fire until the trigger is released or all of the ammunition is exhausted. Tr. 219-25.

D.    Expert testimony

Prior to trial, Olofson submitted a summary of the qualifications of his proposed expert, Len Savage:

Len Savage designs firearms and is the president of Historic Arms LLC, which is a company he founded that designs and builds semiautomatic versions of historic machine guns. Savage holds a Federal Firearms Manufacturing License. Savage has worked closely with the Federal Bureau of Alcohol, Tobacco and Firearms in connection with his firearms manufacturing business. Savage is an expert in the ATF's testing procedures for determining whether a firearm is an "automatic weapon" and with the mechanics of the AR-15 rifle – the firearm that the government alleges was a "machine gun" and was transferred by Olofson.

R. 66.

The summary did not include any description of Savage's opinions, or the bases and reasons for those opinions. Not only was it not clear what Savage's opinions would consist of or be based upon, but when the report was submitted, Savage had not seen Olofson's gun; had not been present at any test-fire of the gun; and had not seen the videotaped test-fire of the gun. Pretrial Tr. 23. All of this, despite the fact that the materials were available for inspection. R. 38; Sent. Tr. 57; Criminal L.R. 16.1 (E.D. Wis.).

At trial, the government asked that Savage not be allowed to be present during the testimony of the government's expert. Particularly in light of the lack of information about Savage's opinions or the bases for those opinions, the government was concerned about Savage conforming his testimony based solely on what he heard at trial; that concern was underscored by Savage's having been precluded from testifying for similar reasons in an earlier case. Tr. 158-59.

## SUMMARY OF THE ARGUMENT

Olofson contends that the district court erred when it declined to instruct the jury that a weapon is a machinegun only if, with a single function of the trigger, it continues to fire until the trigger is released or the ammunition is exhausted. He argues that such an "interpretive gloss" on 18 U.S.C. § 922(*o*) and 26 U.S.C. § 5845(b) is necessary in light of a footnote in *Staples v. United States*, 511 U.S. 600 (1994) and a statement in *United States v. Fleischli*, 305 F.3d 643 (7th Cir. 2002).

Because Olofson's proposed instruction was not a correct statement of the law, the district court did not err when it refused to give the instruction. The instruction is inconsistent with the plain language of § 5845(b), as well as with the statute's history and purpose. Neither *Staples* nor *Fleischli* purported to alter in any way the elements of a § 922(*o*) offense. Neither case addressed a situation like the current one, where a weapon fired repeatedly with a single pull of the trigger but – at least occasionally – stopped firing before the trigger was released and before the ammunition was exhausted. And no court ever has held that, to sustain a charge under § 922(*o*), the government must prove that firing always continues until the trigger is released or until the ammunition is completely exhausted.

The district court did not err in denying Olofson's motion for a judgment of acquittal. Olofson's argument that the evidence was insufficient hinges on his position that the *dicta* from the *Staples* footnote must be engrafted upon the statutory

12

definition of machinegun. That is, he argues that the record does not contain sufficient evidence to support a finding that Olofson's weapon fired repeatedly until the trigger was released or the ammunition was exhausted.

Again, the government was not required to prove that Olofson's weapon fired in that fashion. Nonetheless, there is ample evidence that it did just that. The government's expert testified that when he test-fired the gun, it fired – with one pull of the trigger – all 20 rounds of ammunition loaded in the weapon. The government's expert also testified that, after loading it with another 20 rounds of ammunition, the weapon fired continuously until the trigger was released.

Sections 922(*o*) and 924(a)(2) are not unconstitutionally vague as applied to Olofson's conduct. Olofson argues that, without the *Staples* modification that he proposes, § 922(*o*) fails to provide adequate notice as to what conduct is prohibited. But a reasonable person would have known that the prohibition against transferring a machinegun extended to a weapon that repetitively fired, regardless of whether the weapon always did so until the ammunition was exhausted or the trigger was released. Olofson himself even acknowledged to an ATF agent that he knew a machinegun is a weapon that fires more than one round with a single pull of the trigger.

The district court did not abuse its discretion when it excluded the Olofson's expert during the testimony of the government's expert. Olofson did not establish before the district court that the presence of his expert was "essential" to the presentation of his defense. He argued to the district court that he anticipated the government's expert would testify about malfunctions, and Savage's presence would allow Olofson to "rebut or add information" regarding those malfunctions.

Olofson did have the opportunity to rebut or add information regarding malfunctions, and he availed himself of that opportunity during Savage's direct testimony. Olofson also was able to cross examine the government's expert about malfunctions. In these efforts, he was aided by reports that had been prepared by the government's expert, in which the expert detailed his findings and conclusions from the test-fires he had done of Olofson's gun. Savage had the opportunity to review those reports not only in anticipation of his own direct testimony, but also to assist the defense preparation for cross examination of the government's expert.

Finally, Olofson has not established that the government failed to disclose material, exculpatory evidence in violation of *Brady*. Most of the documents that he has identified relate to the existence of M-16 components in AR-15 rifles in general. Whatever effect those components may have had in other instances has no bearing

upon the issue whether Olofson's weapon fired automatically more than one round with a single pull of the trigger.

With respect to Olofson's request for ATF testing procedures, the government's expert described the procedures used in testing Olofson's gun. To the extent that his request was for a more general statement of procedures used in testing other firearms, Olofson has not demonstrated that those procedures would have had any bearing on whether his gun fired automatically more than one round with a single pull of the trigger.

**ARGUMENT**

I.   Because it is not a correct statement of the law, the district court did not err when it declined to instruct the jury that a weapon is a machinegun only if, with a single function of the trigger, it continues to fire until the trigger is released or the ammunition is exhausted.

Olofson was convicted under 18 U.S.C. § 922*(o)*, which prohibits the knowing transfer of a machinegun.  The term "machinegun" is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(23).  Olofson's argument here centers on the term "automatically" in § 5845(b).

Consistent with § 922*(o)* and § 5845(b), the district court instructed the jury that:

> A machine gun is any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.
>
> To sustain the charge of transferring a machine gun, the government must prove the following propositions:
>
> First, that the defendant knowingly transferred a machine gun; and second, that the defendant knew, or was aware of, the essential characteristics of the firearm which made it a machine gun.

Tr. 219-20.

16

The district court declined the defense request to instruct the jury that a weapon is a machinegun only if, with a single function of the trigger, it continues to fire until the trigger is released or the magazine is emptied. Olofson argues that, in rejecting such an instruction, the district court denied him a fair trial. Def. Br. at 14. Olofson's gun would sometimes jam after multiple rounds were fired with a single trigger pull, but not before the magazine was completely empty; Olofson tried to use that occasional malfunction as a defense.

This Court reviews jury instructions – including a district court's refusal to give a proposed instruction – *de novo*. *United States v. Choiniere*, 517 F.3d 967, 970 (7th Cir. 2008). To warrant a specific instruction, a defendant must show that: (1) the proposed instruction is a correct statement of the law; (2) the evidence in the case supports the theory of defense; (3) the theory is not already part of the charge; and (4) failure to include the proposed instruction denied the defendant a fair trial. *Id.*

Because Olofson's proposed instruction was not a correct statement of the law, the district court correctly refused to give the instruction. No court ever has held that, to sustain a conviction under § 922(*o*), the government is required to prove that, with a single function of the trigger, a weapon continues to fire until the trigger is released or the magazine is emptied. As authority for his position, Olofson cites a

footnote from the Supreme Court's decision in *Staples*, 511 U.S. at 602, n.1.  The

language he relies upon was *dicta*.

At issue in *Staples* was whether the National Firearms Act established a strict

liability offense and, if not, what *mens rea* was required by the Act.  At the outset,

before addressing the issue, the Court explained in a footnote what the terms

"automatic" and "fully automatic" mean:

> As used here, the terms "automatic" and "fully automatic" refer to a
> weapon that fires repeatedly with a single pull of the trigger.  That is,
> once its trigger is depressed, the weapon will automatically continue
> to fire until its trigger is released or the ammunition is exhausted. Such
> weapons are "machineguns" within the meaning of the Act.  We use
> the term"semiautomatic" to designate a weapon that fires only one shot
> with each pull of the trigger, and which requires no manual
> manipulation by the operator to place another round in the chamber
> after each round is fired.

*Staples*, 511 U.S. at 602, n.1.

When it ultimately addressed the issue in the case, *Staples* held that the Act

did not establish a strict liability crime; the government must prove that the

defendant "knew the weapon he possessed had the characteristics that brought it

within the statutory definition of a machinegun."  *Staples*, 511 U.S. at 602; *cf. Bryan*

*v. United States*, 524 U.S. 184, 193 (1998).

Mindful of the *Staples* requirement, the district court here instructed the jury

that, "[t]o sustain the charge of transferring a machine gun, the government must

18

prove . . . that the defendant knew, or was aware of, the essential characteristics of the firearm which made it a machine gun."  Tr. 220.

In sum, *Staples* does not support Olofson's proposed jury instruction.  *Staples* did not address whether a machinegun that occasionally jams still falls within the purview of § 922(*o*).

Olofson also relies on *United States v. Fleischli*, 305 F.3d 643 (7th Cir. 2002), a case in which this Court applied the *Staples* footnote in determining whether the defendant's "minigun" was a machinegun.  The minigun was an aircraft weapon that, with the flip of a switch, would fire between 2000 and 6000 rounds of ammunition per minute.  The Court concluded that "Fleischli's electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition exhausted.  The minigun was therefore a machine gun as defined in the National Firearms Act."  *Id.* at 655-56.

Neither *Fleischli* nor *Staples* addressed a situation like this one: a weapon fired repeatedly with a single pull of the trigger, but – at least on some occasions – stopped firing before the trigger was released and before the ammunition was emptied.  In the six years since *Fleischli* was decided, and the fourteen years since *Staples*, no court has held that, to sustain a charge under § 922(*o*), the government must prove that firing must <u>always</u> continue until the trigger is released or until the

19

ammunition is completely exhausted.  *See, e.g., United States v. Spencer*, 439 F.3d 905, 915 (8th Cir. 2006)(defining a machinegun by directly quoting 26 U.S.C. § 5845(b), and identifying the elements of a § 922(*o*) offense as (1) the defendant possessed a machine gun, and (2) he did so knowingly).  Similarly, the Eleventh Circuit has adopted a pattern jury instruction for § 922(*o*).  That instruction incorporates the *Staples mens rea* requirement, but contains no reference to release of the trigger or exhaustion of all ammunition.  Eleventh Circuit Pattern Jury Instructions - Criminal (2003), Instruction 34.8.

As indicated, Olofson's position finds no support in the language of 26 U.S.C. § 5845(b) or in case law.  It also is contrary to the purpose of the statute.  Under Olofson's approach, Fleischli's minigun would not have qualified as a machinegun if, when loaded with 6,000 rounds of ammunition, it fired 5,999 rounds in sixty seconds but failed – for some reason other than turning off the switch – to fire round number 6,000.

Similarly, Olofson identifies M-16s and Thompson Submachine Guns as weapons that are "commonly viewed as machineguns."  Def. Br. at 33.  But under Olofson's approach, even those guns would not be deemed to shoot automatically if, by design or because of a defect, they shot only 29 rounds from a fully loaded 30-round magazine.

20

Using *Staples'* dicta to engraft an additional requirement onto § 5845(b) would be inconsistent both with the animating purpose of federal machinegun regulations and with Congress's expression of that purpose in the machinegun statutes.

> Congress has closely regulated machine guns . . . since the National Firearms Act of 1934, which subjected machine guns, unlike ordinary firearms, to federal registration and a transfer tax. . . . The Act was the first major federal attempt at firearms regulation, and it expressly targeted machine guns, a modern weapon whose unusual destructive power was of great appeal to organized crime. [T]he 1986 addition of § 922(*o*) [was aimed at] preventing further growth in the number of machine guns in private hands as an exercise of the historic federal interest in the regulation of machine guns.

*United States v. Kenney*, 91 F.3d 884, 890-91 (7th Cir. 1996)(citing, *inter alia*, David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 593 (1986/1987)).

This traditional concern with the exceptional destructive force of machineguns is reflected in, among other places, §§ 922(*o*) and 5845(b), which together prohibit the possession or transfer not only of any weapon that shoots automatically more than one shot with a single function of the trigger, but also any weapon that "is designed to shoot, or can be readily restored to shoot" in such a fashion.[2]  Weapons that

---

[2]In fact, the statutes go even further, and cover as well "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  26 U.S.C. § 5845(b).

would require as much as six to eight hours of work to convert to automatic fire are covered by the NFA because they "can be readily restored" to shoot automatically. *United States v. One TRW, Model M14, 7.62 Caliver Rifle*, 441 F.3d 416, 423 (6th Cir. 2006)(citing cases). Olofson's gun, by contrast, required no restoration; it fired anywhere from three to twenty rounds with a single function of the trigger. And it is that feature – the rapid, repetitive fire that is accomplished by a single pull of the trigger – that makes machineguns singularly destructive.

The difference in the destructive forces of two weapons – weapon A, which will exhaust all of its ammunition with a single function of the trigger, and weapon B, which sometimes may fall just short – by contrast, is negligible. Even more inconsistent with the current and historical animating purpose of machinegun regulation: Under Olofson's approach, a converted AR-15 that will consistently fire 499 rounds of a 500 round magazine with one pull of the trigger before stopping is not one that shoots automatically; a weapon that consistently fires all five rounds from a five-round magazine is. Olofson's approach would, in short, remove from the reach of the federal machinegun statutes weapons that are – in terms of their dangerousness and destructive force – at the core of what Congress intended to regulate.

The instruction that was provided by the district court was consistent with the plain statutory language and the Eleventh Circuit's pattern instruction, and correctly identified the elements of the offense in light of *Staples* and subsequent cases. The instruction requested by Olofson was not an accurate statement of the law, and thus the district court did not err in refusing to present it to the jury.

II.    The district court did not err in denying Olofson's motion for a judgment of acquittal.

Olofson contends that the district court erred in denying his motion for a judgment of acquittal. Def. Br. at 27. Olofson argues that the evidence was insufficient to support the jury's finding of guilt. This Court employs a rigorous standard of review in such claims, inquiring whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d at 504 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see also United States v. Suggs*, 374 F.3d 508, 518 (7th Cir. 2004). In making this assessment, the Court is not to re-weigh the evidence or to determine whether it agrees with the fact-finder's conclusions. The relevant inquiry "does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original); *see also United States v. Brown*, 328 F.3d 352, 355 (7th Cir. 2003). Rather,

the Court is simply to assess the trial record to determine whether it contains evidence from which a reasonable fact-finder could find guilt beyond a reasonable doubt. *United States v. Gougis*, 432 F.3d 735, 743-44 (7th Cir. 2006); *United States v. Graham*, 315 F.3d at 781. Only if the record is entirely devoid of such evidence is reversal warranted. *Curtis*, 324 F.3d at 505.

Olofson's argument hinges on his position that the *dicta* from the *Staples* footnote must be engrafted upon the statutory definition of machinegun. Olofson argues that "footnote 1 of the *Staples* decision . . . would have required evidence that at the single pull of the trigger the AR-15 would have had to 'continue to fire' multiple bursts at the single pull of the trigger 'until the trigger is released or the ammunition is exhausted.' *Staples*, 511 U.S. at 602 n.1." Def. Br. at 28.

For the reasons set forth in Part I above, the government was not required to prove that, with a single pull of the trigger, Olofson's weapon continued to fire until the trigger was released or the ammunition was exhausted. As a result, there is no need for this Court to examine the record to determine whether there was sufficient evidence to allow a reasonable juror to conclude that the weapon operated in that fashion.

Nonetheless, there is ample evidence in the record to show just that. Officer Kingery testified that, when he test-fired Olofson's weapon in November 2006, it

24

continued to fire, with one pull of the trigger, until all 20 rounds of ammunition loaded in the weapon fired. Tr. 109. Kingery also testified that, when he loaded the weapon with another 20 rounds of ammunition, the weapon fired continuously until the trigger was released. Tr. 108-09, 129. Indeed, Olofson appears to acknowledge that, in the videotaped test-fire conducted in February 2007, his weapon fired the entire 20-round magazine "with the single pull of the trigger." Def. Br. at 27.

Olofson contends that this evidence is somehow insufficient simply because, when Kingery went on to offer his opinion on the ultimate issue -- that is, that the weapon was a machinegun -- he based his conclusion on the fact that the gun fired more than one round with a single pull of the trigger. But even if Kingery was mistaken as to the legal definition of a machinegun, the facts underlying his conclusion remain. The details of Kingery's reasoning process are not the principle focus for this Court. Rather, the Court is to review the record and determine whether it contains sufficient evidence to support a particular jury finding. And here, although the government's position remains that such evidence is not required, the record contains ample evidence from which a reasonable juror could conclude that Olofson's weapon, with a single pull of the trigger, fired more than one shot and continued to fire until the trigger was released or the ammunition was exhausted. Tr. 108-09, 129.

III.    Sections 922(*o*) and 924(a)(2) are not unconstitutionally vague as applied to Olofson's conduct.

The defendant argues that § 922(*o*) is, as applied to his conduct, is void for vagueness because under the definition of machinegun used by the district court (without Olofson's proposed narrowing construction of "automatic"), ordinary people cannot tell what conduct is prohibited.

"Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of ordinary notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *see also United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006). Vagueness challenges which do not implicate First Amendment freedoms must be analyzed in light of the application of the statute to the facts of the case at hand. *United States v. Powell*, 423 U.S. 87, 92 (1975). A statute is unconstitutionally vague as applied only if the defendant could not have known that the conduct underlying his conviction was covered by the statute. *United States v. Warner*, 498 F.3d 666, 697 (7th Cir. 2007); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) (explaining that a vagueness challenge "rest[s] on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.").

Like the defendant's arguments above, the defendant's vagueness challenge also implicates the *Staples* footnote.  Olofson argues that, "if *Staples'* narrowing construction of the term 'automatically' is not engrossed upon 26 U.S.C. § 5845(b), then there will be continuing confusion in the general populace about the essential characteristics of a machinegun in violation of the due process requirement that a criminal statute give 'fair warning' of the prohibited conduct."  Def. Br. at 39.

Olofson argues that the district court's definition of "automatic" – a definition that did not include a requirement that a weapon continue to fire repeatedly until the trigger is released or the ammunition is exhausted – is an unorthodox one.  Relying on *Webster's Third International Dictionary* (1962), Olofson contends that the district court's definition is different from the "ordinary dictionary definition."  Def. Br. at 36.  Olofson quotes that dictionary's definition of automatic, as applied to a firearm:

> marked by use of either gas pressure or force of recoil and mechanical spring action for ejecting the empty cartridge case after the first shot, loading the next cartridge from the magazine, firing, ejecting the spent case, and repeating the above cycle as long as the pressure on the trigger is maintained and there is ammunition in the magazine or other loading device.

But other dictionaries define the term automatic without reference to firing as long as the trigger is depressed and there is ammunition in the magazine.  *See, e.g., Merriam-Webster's Collegiate Dictionary* (10th ed. 1999)(defining automatic, in the

context of a firearm, as "using either gas pressure or force of recoil and mechanical spring action for repeatedly ejecting the empty cartridge shell, introducing a new cartridge, and firing it"); *The Random House Dictionary of the English Language* (2nd ed. 1987)(in the context of a firearm, defining automatic as "utilizing the recoil or part of the force of the explosive to eject the spent cartridge shell, introduce a new cartridge, cock the arm, and fire it repeatedly" and defining automatic pistol simply as "a type of pistol having a mechanism that throws out the empty shell, puts in a new one, and prepares the pistol to be fired again.").

Dictionary definitions of "automatic" vary and, in the end, do not further the analysis. The key here is that §§ 922(*o*) and 5845(b) – without the additional modification provided in the *Staples* footnote – provided Olofson with ample notice that the conduct in which he engaged was prohibited. A reasonable person would have known that the prohibition against transferring a machinegun extended to any weapon that the person knows shoots, was designed to shoot, or can readily be restored to shoot more than one shot with a single pull of the trigger. Indeed, Olofson himself acknowledged, when interviewed by an ATF agent, that a machinegun is "a firearm that would expel more than one round with a single pull of the trigger." Tr. 65.

28

The reasonable person was not left to wonder whether conduct like Olofson's fell outside of the statutory prohibition merely because, on occasion, his weapon stopped firing before every last round was expelled. Because §§ 922(*o*) and 5845(b) put Olofson on notice that a transfer of a weapon like he made to Kiernicki is prohibited, the statutes are not unconstitutionally vague as applied in this case.

IV.    The district court did not abuse its discretion when it excluded the defendant's expert during the testimony of the government's expert.

At the request of a party, a trial court shall order witnesses excluded so that they cannot hear the testimony of other witnesses. Fed. R. Evid. 615. The rule "is designed to thwart witnesses from fashioning their testimony to that which has already been given and to help in detecting testimony that is less than truthful." *United States v. Williams*, 136 F.3d 1166, 1168 (7th Cir. 1997)(citing *United States v. Gammon*, 961 F.2d 103 (7th Cir. 1992)). By its terms, the rule does not authorize exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause . . . ." Fed. R. Evid. 615(3).

A district court has broad discretion to exclude witnesses under Rule 615, and its decision in that regard is reviewed only for an abuse of that discretion. *United States v. Edwards*, 526 F.3d 747, 758 (11th Cir. 2008); *United States v. Green*, 324 F.3d 375, 380 (5th Cir. 2003); *cf. United States v. Crabtree*, 979 F.2d 1261, 1270 (7th Cir. 1992)(explaining that, if a witness has violated an exclusion order, the district court

had discretion to allow the witness to testify).  Reversal is appropriate only when a defendant can demonstrate prejudice. *Green*, 324 F.3d at 380.

Olofson at several points characterizes the government's request to exclude his firearms expert, Len Savage, from the courtroom during Kingery's testimony as an attempt to "dupe" or "sand-bag" the defense.  Def. Br. at 41, 47.  Indeed, Olofson falsely claims that the district court "characterized the prosecutor as having 'duped the defense'".  Def. Br. at 41.

Before trial, Savage had not examined Olofson's firearm; had not seen the video-taped test-fire of the firearm; and had not prepared any type of report in anticipation of his testimony.  Nor was it clear what Savage's testimony was going to be; while the joint final pretrial report submitted by the parties summarized Savage's background, it did not describe his opinions and bases and reasons for those opinions.  R. 66:4.[3]  Under similar circumstances, Savage previously had been precluded from testifying as a witness in a separate federal criminal case.  In that earlier case, Savage was not permitted to testify because he had been allowed to be present during the testimony of the government's expert.  Tr. 158-159.  It was those

---

[3]Savage claims that, "[a]s a direct consequence of the court's exclusion order, defense expert Savage was severely limited in his access to information about the Olofson rifle and ATF's theory as to why it was a machinegun . . . ."  But the defense had access to Kingery's reports, which covered the same topics as did his trial testimony; and was free to inspect before trial not only Olofson's gun, but also the videotaped test-fire of the gun.

concerns – and not a plan to "dupe" or to "sand-bag" the defense, that motivated the government to request that Savage be excluded.

Olofson argues that Savage was improperly excluded under Rule 615(3), because the exclusion "made it difficult to examine or rebut the government's witness." Def. Br. at 45. The Rule 615(3) exemption extends only to those persons whose presence is *essential*; it does not cover individuals whose presence is merely desirable or helpful. *Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 629 (4th Cir. 1996); *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995); *United States v. Charles*, 456 F.3d 249, 258 (1st Cir. 2006)(distinguishing Rule 615(2) from Rule 615(3) on the basis that the latter "provides for an indispensable person to sit at counsel table.").

Olofson did not establish before the district court that Savage's presence was essential. He offered two justifications for Savage's presence. First, Olofson argued that "under Rule 703 Mr. Savage should be allowed to be present to hear the government's expert's testimony because some of those facts may be relevant to any opinion which he would in fact give." Tr. 91.

Rule 703 does not provide a basis for an automatic exemption under Rule 615(3). Rule 703 simply provides that an expert *may* base his opinion on facts made known to him at trial. He may also base his opinion on facts learned prior to trial. And here, the defense had the reports prepared by Kingery that detailed his tests of

31

Olofson's gun and that explained the basis for his conclusion that the gun was a machinegun. And nothing prevented Olofson's counsel from asking Savage to assume certain facts – that is, facts to which Kingery testified at trial – and to offer opinions based on those assumed facts.

Olofson's sole other justification for his expert being present was that "there are some malfunctions that I think will be at issue in [the government's expert's] testimony. I would like to have Mr. Savage present so he can hear what Mr. Kingery testifies to regarding those malfunctions so that if the information concerning those malfunctions is in our eyes not complete or incorrect, we have the ability to either rebut or add information to that." Tr. 91-92.

Olofson did have the opportunity to rebut or add information regarding malfunctions, and he availed himself of that opportunity during Savage's direct testimony. Savage testified in detail about "the nature and significance of the difference in the ammunition" and primers. Tr. 171-74.

Given the two bases offered by Olofson, the district court did not abuse its discretion when it excluded Savage during Kingery's testimony. Although this Court's review properly focuses on the reasons put before the district court, even the post-hoc rationale offered by Olofson on appeal fails to establish that Savage's presence was essential to the presentation of the defense.

On appeal, in support of his contention that exclusion of his expert "made it difficult to examine or rebut the government's witnesses," Olofson identifies three respects in which that was so. First, Olofson points to Kingery's testimony regarding the varying hardness of primers on ammunition used in separate test-fires of Olofson's gun. Def. Br. at 45. Kingery testified that, in his first test of Olofson's gun, he used military-grade ammunition. In that test, Olofson's gun did not fire more than one round with a single pull of the trigger, even with the selector switch in the unmarked third position. In his second and third tests, Kingery used civilian-grade ammunition, which had a softer primer than the military-grade ammunition used in the first test. Loaded with the civilian-grade ammunition, Olofson's gun fired more than one round with a single pull of the trigger. In fact, in those tests, Olofson's gun continued to fire until the trigger was released or the ammunition in the gun was exhausted. Tr. 108-09, 129.

Olofson contends that, without his expert present in the courtroom, the defense's ability to cross examine Kingery about the nature and significance of the different types of primers was undermined. Def. Br. at 45-46. But the defense did cross examine Kingery on the issue of primers. Tr. 127-28. And the defense was aided in its cross examination by the government's pretrial disclosure of reports that

Kingery had prepared that detailed his tests of Olofson's gun; the issue of softer primered ammunition in the latter tests was discussed in those reports.

The defense expert had an opportunity to review all of the reports that Kingery prepared in connection with this case.  Tr. 169, 171.  Since those reports highlighted the primer issue, the expert had an opportunity after reviewing the reports to assist in the preparation for cross examination of Kingery on that issue.

Olofson also argues that his expert's exclusion during Kingery's testimony kept his attorney from being able to challenge Kingery on a specific piece of what Olofson characterizes as misleading testimony.  Kingery testified that "military designed firearms have what's called a free floating firing pin." Tr. 107.  Olofson claims that, by this testimony, Kingery "clearly implied that [civilian rifles such as an AR-15] had no 'free floating pin'" and therefore do not need to use hard primer ammunition.  Def. Br. at 46.

Kingery did testify that military firearms have a free-floating pin.  He did not, however, imply that AR-15s or other civilian guns do not have such a pin.  A review of his testimony shows that Kingery was contrasting the way that military guns are treated by their users; military use typically is rougher use than is civilian use. While both M-16s and AR-15s may have a floating pin, the combination of the

34

floating pin and the rough military use necessitates use of harder primers.  As Kingery explained,

> a soldier handling a weapon of this type, he's going to be handling it on a battlefield, jumping in and out of vehicles, into ditches and things like this.  The firearm's going to be handled fairly roughly, and that's going to cause this firing pin to move quite a bit back and forth, often striking the primer.  And the intent is with the harder primer, is that it be necessary for a great deal of force to be applied to it to allow it to go off so that it doesn't go off accidentally.

Tr. 107-08.  A free-floating pin in a civilian-use weapon doesn't raise the same concerns of inadvertent fire that arise in a military-use weapon.  There was, in short, no misleading testimony regarding the free-floating pin.

Finally, Olofson contends that Savage's presence would have been helpful during Kingery's testimony about the procedures used in the second test-fire. Kingery testified that, during that test-fire, he did not test whether the gun fired when the selector was in the "fire" position.  Tr. 108-09.  Kingery explained, on both direct and cross examination, that such a test was not necessary, because he had already determined during the first test-fire that the gun fired in the "fire" position. Tr. 108, 127-28.

While Olofson acknowledges that Kingery was cross-examined about the second test, he suggests that, had Savage been present, Olofson's attorney would not have been "diverted by FEO Kingery's technical discussion of 'hammer follow.'"

Def. Br. at 47.  Olofson argues that, had Kingery checked the "fire" setting in the second test, "he might have discovered the soft/softer primered ammunition had also caused multiple round fire in that position as well."  Def. Br. at 47, n.15.  But Kingery actually was expressly asked about that possibility on cross- examination.  Tr. 127-129.  And Savage could have been asked about that possibility on direct examination.

Even with the benefit of hindsight, Olofson identifies no specific material piece of information which – because of Savage's exclusion during Kingery's testimony – was kept from the jury; much less has he shown that the information was essential or that he was prejudiced by its absence.

In the justification that he offered to the district court, Olofson did not establish any significant way in which Savage's presence during Kingery's testimony would be helpful; he most definitely did not show that Savage's presence was essential.  The district court therefore did not abuse its discretion in excluding the expert from the courtroom while Kingery testified.  Moreover, even the after-the-fact rationale that Olofson now offers does not establish that Savage's presence was essential.

V.    Olofson has not established that the government failed to disclose material, exculpatory evidence in violation of *Brady*.

The government has an obligation to disclose to the defendant material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a defendant must show (1) that the evidence was material and favorable to him; (2) that the evidence was suppressed by the government; and (3) that prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Favorable evidence is material only . . . 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)(quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial" is insufficient. *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

Olofson identifies four requests that he made in the district court:

- Request No. 2 called for the testing procedures used in the testing and examination of defendant's firearm;

- Request No. 4 called for all ATF correspondence to and from the manufacturer of defendant's rifle, SGW/Olympic Arms, regarding the use of M-16 triggers, hammers, disconnectors, and safety selector in AR-15 type firearms between the dates of 1980 and 1990 [the date of the manufacture of defendant's rifle];

- Request No. 5 called for all documents relating to the removal, correction, or update of any AR-15 type rifles with M-16 components from the NFRTR

(NFA registry), the central registry of NFA firearms maintained by ATF, from 1986 to 2008; and

- Request No. 6 called for documents relating to the refusal by ATF to accept any AR-15 type firearm with M-16 components for registration in the NFTR.

Def. Br. at 48.

To the extent that Request No. 2 called for a description of the procedures used in testing Olofson's firearm, Kingery described those procedures in detail at trial. Tr. 101-74.

To the extent that Request No. 2 sought any more general internal testing procedures that were in place when Olofson's gun was test fired, Olofson has not established that a description of any such procedures would be either material or exculpatory. Olofson argues that if there are such procedures, and if he could show that his gun was not tested according to the established procedures, it "could demonstrate that the tests had been manipulated" to achieve a desired outcome. Def. Br. at 49. At best, Olofson is simply speculating about "the mere possibility" that such procedures might have helped the defense. He has not established a *Brady* violation with respect to Request No. 2.

Request Nos. 4, 5, and 6 each request correspondence or documents that relate to the presence of M-16 components in AR-15 rifles. At Olofson's sentencing hearing, the government submitted for the district court's *in camera* review the one

document responsive to Request No. 4.  After a brief inspection, the district court found that the document was not exculpatory.  Sent. Tr. 7-8.  The district court's rationale applies with equal force here, and with respect to Request Nos. 5 and 6, as well: "it was not necessary and crucial to the government's case to establish that the weapon in this case was manufactured with M-16 parts.  What was and remains crucial is the requirement that the rifle in question met the definition of the statutes; that is, it was crucial that the government establish that the weapon in this particular case could fire automatically more than one shot without manual reloading by a single function of the trigger."  Sent. Tr. 4.

The existence of M-16 components in other AR-15 rifles – and any opinion that ATF might have expressed as to whether those particular weapons were machineguns – has no bearing upon whether Olofson's weapon was a machinegun. Criminal liability under § 922(*o*) does not depend on the existence or nonexistence of any particular part or combination of parts.  The statute focuses instead on the manner in which a particular weapon – not any class of weapons – functions.  Thus, the issue here was whether Olofson's weapon shot, was designed to shoot, or could readily have been restored to shoot, automatically more than one round with a single pull of the trigger.  There never has been any showing that the documents sought by Olofson had any bearing on that issue.

39

Olofson has not, in short, established that the evidence he sought was material and exculpatory. He has not demonstrated a reasonable probability that, had the evidence been disclosed to the defense, the result of his trial would have been different.

CONCLUSION

Based on the foregoing, the government respectfully requests that the Court affirm the district court's judgment of conviction.

Dated at Milwaukee, Wisconsin, this 24th day of October, 2008.

Respectfully submitted,

STEVEN M. BISKUPIC
United States Attorney

By:

GREGORY J. HAANSTAD
Assistant United States Attorney

530 United States Courthouse
517 East Wisconsin Avenue
Milwaukee, WI  53202
(414) 297-1700

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify, pursuant to Circuit Rule 32(a)(7)(B)(i) that this brief complies with the type volume limitations in Circuit Rule 32(a)(7)(B)(i) because it contains 9,070 words according to the word processing system used to prepare the brief.

I hereby certify that on the 24th day of October 24, 2008, a PDF version of the Brief of Plaintiff-Appellee was sent via the Internet, and that an original and fourteen (14) hard copies of the Brief of Plaintiff-Appellee were sent via overnight express to Gino F. Agnello, Clerk of Court, United States Court of Appeals for the Seventh Circuit, 219 South Dearborn Street, Room 2722, Chicago, IL 60604; two (2) hard copies and one diskette containing the Brief of Plaintiff-Appellee were mailed to:

William J. Olson
William J. Olson, P.C.
8180 Greensboro Drive, Suite 1070
McLean, VA 22102-3860


_____
GREGORY J. HAANSTAD
Assistant United States Attorney

530 United States Courthouse
517 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-1700