No. 08-2294

=============================

**In The**
**United States Court of Appeals**
**for the Seventh Circuit**

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID R. OLOFSON,

*Defendant-Appellant.*

————————————

**On Appeal from the United States District Court**
**for the Eastern District of Wisconsin**

————————————

**Reply Brief of Appellant**

————————————

ROBERT E. SANDERS
  MARK BARNES & ASSOCIATES
  1350 I Street, N.W., Suite 1255
  Washington, DC 20005
  (202) 408-5030

HERBERT W. TITUS*
WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
WILLIAM J. OLSON, P.C
  8180 Greensboro Drive, Suite 1070
  McLean, VA  22102-3860
  (703) 356-5070

*Attorney of Record

November 7, 2008

Counsel for Appellant

=============================

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.    The Government Brief Rests upon an Erroneous Factual Premise
      Completely Unsupported by the Record. . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   Staples and Fleischli Correctly State the Law Governing the
      Definition of "Automatically" as It Appears in the 26 U.S.C. Section
      5845(b) Definition of a Machinegun. . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      A.   The Staples Definition of "Automatically" Was Not Just "Dicta," But a
           Well-Considered and Integral Part of the Holding of the Case. . . . . . . . . . .  5

      B.   The Staples Case Involved a Firearm that the Defendant Claimed
           Fired Multiple Shots as a Result of a Malfunction. . . . . . . . . . . . . . . . . . .  7

      C.   The Staples Definition of "Automatically," as it Appears in 26 U.S.C.
           Section 5845(b), and as Embraced in Fleischli, is Binding Law. . . . . . . . . .  10

III.  The Evidence Was Insufficient to Sustain Olofson's Conviction. . . . .  13

IV.   The Dictionary Definitions Cited Do Not Support the
      Government's Idiosyncratic Reading of "Automatically". . . . . . . . . . .  16

V.    The Government Has Failed to Rebut Olofson's Claim That the
      Trial Court's Exclusion of the Defense Expert Was Prejudicial
      Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      A.   The Trial Court's Ruling Deprived Olofson of Expert Testimony
           Contrary to the Provisions of Rule 703. . . . . . . . . . . . . . . . . . . . . . . . . .  18

      B.   The Government Has Not Carried Its Burden to Show that Olofson
           Was Not Prejudiced by Excluding the Defense Expert. . . . . . . . . . . . . . . .  21

VI.   The Trial Court Committed Prejudicial Error in Denying
      Olofson's Discovery Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

# TABLE OF AUTHORITIES

**Page**

## CASES

<u>Central Virginia Community College</u> v. <u>Katz</u>, 546 U.S. 356 (2006). . . . . . . . . . . . . . 7

<u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Malek</u> v. <u>Federal Insurance Co.</u>, 994 F.2d 49 (2nd Cir., 1993). . . . . . . . . . . . . . . . . 21

<u>Morvant</u> v. <u>Construction Aggregates Corp.</u>, 570 F.2d 626 (6th Cir., 1978). . . . . . . . 18

<u>Opus 3 Limited</u> v. <u>Heritage Park, Inc.</u>, 91 F.3d 625 (4th Cir., 1996). . . . . . . . . . . . 18

<u>Rogers</u> v. <u>United States</u>, 522 U.S. 252 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>Staples</u> v. <u>United States</u>, 511 U.S. 600 (1994). . . . . . . . . . . . . . . . . . . . . . . . 4, *passim*

<u>United States</u> v. <u>Crabtree</u>, 979 F.2d 1261 (7th Cir., 1992),
    <u>cert</u>. <u>denied</u>, 510 U.S. 878 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>United States</u> v. <u>Fleischli</u>, 305 F.3d 643 (7th Cir., 2002). . . . . . . . . . . . . . 5, *passim*

<u>United States</u> v. <u>Gammon</u>, 961 F.2d 103 (7th Cir., 1992). . . . . . . . . . . . . . . . . . . . . 18

<u>United States</u> v. <u>Green</u>, 324 F.3d 375 (5th Cir., 2003). . . . . . . . . . . . . . . . . . . . . . . . 21

<u>United States</u> v. <u>Jackson</u>, 60 F.3d 128 (2nd Cir., 1995). . . . . . . . . . . . . . . . . . . . . . . 21

<u>United States</u> v. <u>Kenney</u>, 91 F.3d 884 (7th Cir., 1996). . . . . . . . . . . . . . . . . . . . . . . . 11

<u>United States</u> v. <u>Seschillie</u>, 310 F.3d 1208 (9th Cir., 2002). . . . . . . . . . . . . . . . 44, 45

<u>United States</u> v. <u>Staples</u>, 971 F.2d 608 (10th Cir., 1992), *rev'd.*, 511 U.S. 600
    (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

<u>United States</u> v. <u>Williams</u>, 136 F.3d 1166 (7th Cir., 1997). . . . . . . . . . . . . . . . . . . . 18

<u>United States</u> v. <u>X-Citement Video, Inc.</u>, 513 U.S. 64 (1994). . . . . . . . . . . . . . . . . . 14

## FEDERAL RULES OF EVIDENCE

Rule 615. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rule 703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## GOVERNMENT PUBLICATIONS

ATF Rul. 2006-2 (Dec. 13, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

Memorandum on ATF Firearms Testing Procedures, (Cong. Research Serv.,
    Oct. 19, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**ARGUMENT**

**I.    The Government Brief Rests upon an Erroneous Factual Premise Completely Unsupported by the Record.**

According to the Government, the issue in this case is "whether a machinegun that occasionally jams still falls within the purview of § 922(o)."  *See* Brief of Plaintiff-Appellee ("Govt. Br."), p. 19.  The Government's statement erroneously presupposes that Olofson's rifle is a machinegun, which rests upon a misstatement of the facts established at trial.

According to the Government, it was established at trial that:

> Olofson's gun would **sometimes jam after multiple rounds** were fired with a single trigger pull, but **not before the magazine was completely empty**.  Olofson tried to use that occasional **malfunction** as a defense.  [Govt. Br., p. 17 (emphasis added).]

The Government provides no record citation for this remarkable statement — that Olofson's gun never jammed before the magazine was emptied — because there is none.  To the contrary, the prosecution's witness — Robert Kiernicki, the person to whom Olofson had loaned his AR-15 on July 13, 2008 — testified that, on each of two or three occasions when Kiernicki placed the firearm in the third selector position, the AR-15 "shot three rounds or maybe four when I pulled the trigger and then it jammed."  Tr. 39, ll. 15-18; 46, ll. 22-24.  When asked by defense counsel whether "there was more ammunition in the gun" at the time that it "jammed," Kiernicki testified in the affirmative.  Tr. 46, l. 25 – 47, l. 2.  When asked further by defense counsel whether Kiernicki had "tak[en] [his] finger off the trigger; [or had]

just jammed while [his] finger was on the trigger," Kiernicki again testified his finger was on the trigger.  Tr. 47, ll. 3-6.

At no point did the prosecutor challenge this testimony.  Rather, in an effort to clarify it, the prosecutor posed this question:  "[S]o you are testifying that you fired Mr. Olofson's AR-15 in **regular semi-automatic mode** approximately 100 to 200 rounds and then **tried to fire it automatically?"**  Tr. 58, ll. 20-23 (emphasis added).  To which Kiernicki answered:  "Yes."  Tr. 58, l. 24.  To which the prosecutor responded:  "And then the gun jammed."  Tr. 58, l. 25.  To which Kiernicki said:  "Yeah."  Tr. 59, l. 1.

In sum, on July 13, 2006, the date on which Olofson loaned his semi-automatic AR-15 to Kiernicki, the only evidence that the AR-15 would fire more than one shot at the single pull of a trigger was Kiernicki's testimony that it did so as a result of a malfunction **before** the magazine was emptied of its ammunition, and **not,** as the Government has summarized, simultaneously with the exhaustion of the ammunition.  Indeed, when first "test-fired" in **October 2006** by an ATF expert, the AR-15 successfully fired in the "semi-automatic position" (Tr. 105, ll. 14-22), but **failed to fire more than one shot** when placed in the third position.  Tr. 106, ll. 1-8.  As a result of this initial test, the ATF agent concluded that Olofson's AR-15 was **not a machinegun**.  Tr. 124, l. 24 – 125, l. 1.

It was not until the ATF partially retested the weapon in November 2006 that the ATF agent got the AR-15 to fire multiple shots at the single pull of the trigger at all, and somehow without jamming.  Tr. 107, l. 11 – 109, l. 25.  *See* Olofson Br.,

3

pp. 46-47.  By this time, the weapon had been in the hands of the ATF for four months.  What caused the functional change in the weapon to fire as it had not done before is unknown, although the ATF agent did acknowledge that the change in the outcome from the October test resulted from a change to "softer primer" ammunition.  *See* Tr. 107, l. 11 – 108, l. 12.  *See also* Tr. 127, ll. 3-15.   Even then, the agent testified that, in his opinion, the AR-15 was a machinegun only because it fired "more than one round at the single pull of the trigger," without regard to whether the ammunition was exhausted or the trigger was released.  *See* Tr. 110, ll. 1-7.

      As the prosecution's question to Kiernicki clearly indicated, Olofson's AR-15 rifle was designed to operate in "regular semi-automatic mode," and that when Kiernicki had tried to fire it automatically, it jammed, indicating that Kiernicki was attempting to do something with the firearm that is was not designed to do.  Thus, all of the record evidence concerning the function of the rifle when in Olofson's possession indicated that if the AR-15 fired more than one shot with a single pull of the trigger it was due to a malfunction.

      Therefore, based on the actual record, the question before this court on appeal is not "whether a machinegun that occasionally jams falls within the purview of § 902(o)."  Rather, the question is whether a semi-automatic firearm is a machinegun **solely** because it could be fired more than one shot at the single pull of a trigger, when such firing occurred as a result of a malfunction.  According to Olofson's defense at trial the answer is no, such a firearm does not meet the "fully

4

automatic" criterion set forth in 26 U.S.C. section 5845(b), as established by the

Supreme Court in <u>Staples</u> v. <u>United States</u>, 511 U.S. 600, 602, n.1 (1994). In an

attempt to divert this Court's attention from this malfunction issue, the

Government repeatedly has posed the hypothetical questions regarding whether a

machinegun designed to shoot more than one shot with the single pull of a trigger

until the trigger is released or the ammunition exhausted would cease to be

classified as a machinegun if it malfunctioned because for some reason or other it

failed to exhaust all of the ammunition in the magazine. *See* Govt. Br., pp. 20, 22.

If a firearm were designed to fire automatically, but for some reason failed to expel

the last round from the magazine, that would be evidence it was a malfunctioning

machinegun under 26 U.S.C. section 5845(b), not because it "shoots" automatically,

but because it is "designed" so to shoot. If, however, a firearm is designed as a

semi-automatic, such as Olofson's AR-15, then the question posed by the

Government's hypotheticals are irrelevant to the issue in this case.


II.    **<u>Staples</u> and <u>Fleischli</u> Correctly State the Law Governing the Definition of "Automatically" as It Appears in the 26 U.S.C. Section 5845(b) Definition of a Machinegun.**

    The Government's entire argument, that the district court did not err "when it

declined to instruct the jury that a weapon is a machinegun only if, with the single

function of the trigger, it continues to fire until the trigger is released or the

ammunition is exhausted," rests on the **sole** ground that such instruction "was not

an accurate statement of the law." *See* Govt. Br., p. 23. The Government's position

5

directly contradicts both the Supreme Court in <u>Staples</u> v. <u>United States</u>, 511 U.S.

600 (1994), and this Court in <u>United States</u> v. <u>Fleischli</u>, 305 F.3d 643 (7th Cir.,

2002).

**A. The <u>Staples</u> Definition of "Automatically" Was Not Just "Dicta," But a Well-Considered and Integral Part of the Holding of the Case.**

The Government does not contest that Olofson's request for a jury instruction on

the definition of "automatically" is supported by <u>Staples</u> v. <u>United States</u>, 511 U.S.

600, 602, n.1 (1994) (Govt. Br., pp. 12-13, 17-18), but dismisses <u>Staples</u> as "dicta."

*Id.*, p. 18.

In <u>Staples</u>, the Court identified the issue to be whether "the Government should

have been required to prove beyond a reasonable doubt that [defendant] **knew** the

weapon he possessed had the **characteristics** that brought it within the statutory

definition of a machinegun." <u>Staples</u>, 511 U.S. at 602 (emphasis added). The Court

then summarized its holding that the Government should have been so required.

*Id.* (emphasis added).

Thus, the Court began its analysis by quoting the language of 26 U.S.C. section

5845(b), and by singling out "automatically," for clarification:

> As used here, the terms "automatic" and "fully automatic" refer to a
> weapon that fires repeatedly with a single pull of the trigger. That is,
> once its trigger is depressed, the weapon will automatically continue to
> fire until its trigger is released or the ammunition is exhausted. Such
> weapons are "machineguns" within the meaning of the Act. [*Id.*, at
> 602, n.1].

6

By this clarification, the Court signaled that it was not enough that a weapon "shoots, is designed to shoot, or can be readily restored to shoot ... more than one shot, without manual reloading, by a single function of the trigger" for that weapon to be classified as a machinegun. Rather, it must shoot, be designed to shoot or readily be restored to shoot "repeatedly with a single pull of the trigger ... until its trigger is released or the ammunition exhausted."

The Government would have this Court read Staples as if it resolved the *mens rea* issue in the abstract. *See* Govt. Br., pp. 18-19. But the Court in Staples repeatedly identified the *mens rea* issue before it to be petitioner's mental state in relation to "the **particular characteristics** that make his weapon a statutory firearm," *i.e.*, a machinegun. *Id.*, 511 U.S. at 609 (emphasis added). *See also* 511 U.S. at 614-15, 616, 619, 620. Hence, the Court concluded that "to obtain a conviction, the Government should have been required to prove that petitioner knew of the **features** of his AR-15 [rifle] that brought it within the scope of the [National Firearms] Act," namely, that it operated as a machinegun. *Id.*, 511 U.S. at 619.

Not only is the Government's proposed reading of Staples belied by the majority opinion, but also by dissenting Justice Stevens' description of Justice Ginsberg's concurring opinion — in which she "conclude[d] that proof of knowledge that a weapon is "'a dangerous device of a type that would alert one to the likelihood of regulation'" is not an adequate *mens rea* requirement, but that proof of knowledge that the weapon possesses "'**every last characteristic**'" that subjects it to

regulation is." <u>Staples</u>, 511 U.S. at p. 637.  *See also* <u>Rogers</u> v. <u>United States</u>, 522

U.S. 252, 254, n.2 (1998) ("Under our decision in <u>Staples</u> ..., the *mens rea* element ...

**requires** the Government to prove that the defendant **knew** that the item he

possessed had the **characteristics** that brought it within the statutory definition

of a [machinegun].") (emphasis added).

In short, <u>Staples</u> footnote 1, setting forth with particularity the essential

characteristics of the automatic nature of a machinegun, is not "dicta ... in which

the point now at issue was not fully debated"[1]; rather, the <u>Staples</u> definition was

integral to the case.

**B. The <u>Staples</u> Case Involved a Firearm that the Defendant Claimed
Fired Multiple Shots as a Result of a Malfunction.**

According to the Government, the <u>Staples</u> definition of "automatic" should be

disregarded because it did not "address[] a situation like the current one, where a

weapon fired repeatedly with a single pull of the trigger but ... stopped firing before

the trigger was released and before the ammunition was exhausted."  *See* Govt. Br.,

p. 12.  As pointed out in Olofson's opening brief, defense counsel urged the trial

court to incorporate his proposed jury instruction containing the <u>Staples</u> definition

of automatically because "the firearm at issue here was actually the 'same exact

model of firearm ... in ... Staples.'"  Brief of Appellant ("Olofson Br."), p. 16.  Indeed,

the firearm involved in <u>Staples</u>, like Olofson's firearm, was a semiautomatic AR-15

---

[1]    *See* <u>Central Virginia Community College</u> v. <u>Katz</u>, 546 U.S. 356, 363
(2006).

rifle with certain M-16 parts. *Compare* <u>Staples</u>, 511 U.S. at 603 *with* Olofson Br., pp. 4, 7-8. The issue in <u>Staples</u>, like the one in this case, was whether the AR-15 with certain M-16 parts functioned as a machinegun. *Compare* <u>Staples</u>, 511 U.S. at 603 *with* Olofson Br., pp. 7-8. The petitioner in <u>Staples</u>, like Olofson here, claimed that, if the AR-15 fired multiple rounds at the single pull of the trigger, it was the result of a "malfunction," not evidence of a "fully automatic" weapon. *Compare* <u>United States</u> v. <u>Staples</u>, 971 F.2d 608, 613 (10th Cir., 1992) and <u>Staples</u>, 511 U.S. at 603 *with* Olofson Br., pp. 4, 6-9.

The similarity of both firearms and the dispute whether a malfunctioning AR-15 with M-16 parts operated as a machinegun is even more strikingly revealed by an examination of the parties' briefs in <u>Staples</u>. In its brief, the Government acknowledged that the defendant's defense expert had testified at trial that:

> [T]he automatic firing capability of petitioner's AR-15 was the result of a **malfunction**, known as '**followdown**' created by the failure of the disconnector to retain the **hammer** in a cocked position after the discharge of each round. [Brief for the United States ("Staples U.S. Br."), pp. 10-11, 1992 U.S. Briefs 1441; 1993 U.S.S.Ct. Briefs LEXIS 695* (emphasis added).]

Additionally, the Government's brief acknowledged that, based on the petitioner's testimony that he did not know "that the weapon was capable of firing in a fully automatic mode," the petitioner had "proffered an instruction to the jury ... that the possessor knew that the gun would fire fully automatically...." Staples U.S. Br., pp. 11-12.

In his brief, the petitioner in <u>Staples</u> asserted that:

9

> The government's evidence that this AR-15 fired multiple shots with a single trigger pull (not automatically) was revealed [as having] **malfunctioned** to sporadically shoot multiple shots with a single trigger pull.  [Brief of Petitioner, ("Staples Pet. Br.") pp. 10-12, 1992 U.S. Briefs 1441; 1993 U.S. S. Ct.Briefs LEXIS 696* (emphasis added).]

Additionally, the <u>Staples</u> petitioner recounted the testimony of his own expert, who opined that the malfunction was "known as 'hammer-follow down'" and that, although such a malfunction would "produce multiple shots[,] [he] could not call [such shots] automatic fire...."  Staples Pet. Br., p. 16.

As was true in <u>Staples</u>, so it was here.  There was testimony from both the prosecution and defense experts that Olofson's AR-15 suffered from a "hammer follow" malfunction.  *See* Olofson Br., p. 6 and Tr. 169, l. 13 – 171, l. 7.  Indeed, in the prosecution expert's initial test, the AR-15 experienced a "hammer follow" malfunction, leading the expert to conclude that the firearm was not a machinegun.  *See* Olofson Br., p. 6.  And the defense expert testified categorically that the AR-15 "hammer follow" malfunction did not justify the AR-15 to be classified as a machinegun.  Tr. 173, l. 9 – 174, l. 15.

There was evidence in this case, as well as in <u>Staples</u>, that neither defendant had knowledge that the AR-15 involved would function as a "fully automatic" weapon.  *Compare* Olofson Br., pp. 4-5, 26-33 *with* Staples Pet. Br., pp. 20-27.  Thus, each defendant sought from the trial court an instruction that included a definition of "automatically."  *Compare* Olofson Br., pp. 14-26 *with* <u>United States</u> v. <u>Staples</u>, 971 F.2d at 616.

10

At oral argument before the Supreme Court in <u>Staples</u>, a dialogue ensued between counsel for the United States and the Court regarding the adequacy of the jury instruction in light of the evidence in <u>Staples</u> that the firearm in question may have fired multiple shots as a result of a malfunction.  *See* Transcript Oral Argument, No. 92-1441 (Sup. Ct., Nov. 30, 1993), 1993 U.S. Trans. 115*, pp. 29-35. One justice posed the question:  "If the statute is ambiguous, isn't that an argument for requiring specific knowledge of [the firearm's] characteristics, as opposed to strict liability?"  *Id.*, at 31.  In response, the Government conceded that it would have the burden of proving that the firearm in question "has the general capability of shooting automatically" and that there was "conflicting evidence in this case," *id.*, at 31-32, and that the jury had not been instructed in such a way that it could have resolved the question whether the firearm had fired multiple shots as a result of a "defect."  *Id.,* at 32-35.

Without question, the Government's argument — that <u>Staples</u> did not address whether a firearm that fired multiple shots at the single pull of the trigger as a result of a defect was a machinegun — is not supported by the record.

## C. The <u>Staples</u> Definition of "Automatically," as It Appears in 26 U.S.C. Section 5845(b), and as Embraced in <u>Fleischli,</u> Is Binding Law.

The Government asserts that "Olofson's proposed instruction" incorporating the <u>Staples</u> definition of "automatically" is "not a correct statement of the law" (Govt. Br., p. 12), and that "the district court correctly refused to give the instruction," Govt. Br., p. 17, on the theory that Olofson's request "finds no support in the

11

language of 26 U.S.C. § 5845(b) or in case law [and] is contrary to the purpose of the statute."  Govt. Br., p. 20.  Once again, the Government is in error.

The Government contends that the Staples definition is "inconsistent both with the animating purpose of federal machinegun regulations and with Congress's expression of that purpose in the machinegun statutes," mistakenly relying on United States v. Kenney, 91 F.3d 884, 890-91 (7th Cir., 1996).  See Govt. Br., p. 21. But Kenney dealt with whether 18 U.S.C. section 922(o) was unconstitutional on the theory that it exceeded the scope of Congress's legislative power under the Commerce Clause, and is inapposite.  See Kenney, 91 F.3d at 885.

It is noteworthy that the Government, on the one hand, tries to rely on Kenney, which obviously did not address the question now before this Court, and on the other attempts to distinguish United States v. Fleischli, 305 F.3d 643 (7th Cir., 2002), on the ground that Fleischli concerned a trigger unlike the one in this case, a distinction obviously not at issue here.  See Govt. Br., pp. 19-20.  Completely omitted from the Government's brief, however, is the portion of the Fleischli opinion devoted to the question whether the aircraft weapon "fire[d] automatically," the legal question common to both cases.  On that question, the Fleischli Court quoted the Staples footnote verbatim, observing:

> Fleischli dismisses this passage as not binding, arguing that the Court did not define "automatically" but rather defined "automatic."  We think the Court's meaning is plain enough.  If Fleischli's minigun, with one application of the trigger, continued to fire until the trigger was released or the ammunition exhausted, it was a machine gun within the meaning of the Act.  [Fleischli, 305 F.3d at 655].

12

In short, the Government — like <u>Fleischli</u> — is arguing that the <u>Staples</u> definition of "automatically" is not binding.  Not only that, the Government actually contends that the <u>Staples</u> definition is "inconsistent with the plain language of § 5845(b)."  Govt. Br., p. 12.  At no point, however, has the Government explained why <u>Staples</u> is inconsistent.  As the <u>Fleischli</u> Court points out, "[t]he word[] "automatic" [is] not defined in the statute or regulations."  <u>Fleischli</u>, 305 F.3d at 655.  Moreover, as <u>Fleischli</u> further states, the <u>Staples</u> definition is a "commonsense" one.  *Id.*  And, as the Supreme Court has noted:  "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."  <u>Smith</u> v. <u>United States</u>, 508 U.S. 223, 228 (1993).

The Government appears to have no regard for such rules or precedents.  Indeed, it has completely refused to respond to the various sources cited by Olofson in defense of the <u>Staples</u> definition.  *Compare* Govt. Br., pp. 16-23 *with* Olofson Br., pp. 18-19, 36-37.  And it has not even acknowledged that the ATF, itself, has given the <u>Staples</u> definition its endorsement.  *See* Olofson Br., pp. 18-19, 37-38.  Yet, in ATF Rul. 2006-2, the ATF issued a ruling addressing requests from "several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm[, which] when attached ... result in the firearm discharging more than one shot with a single function of the trigger."  ATF Rul. 2006-2, p. 1 (Dec. 13, 2006).  Instead of examining the question utilizing the naked language of the statute, the ATF issued a ruling in which it "Held" that the device in question was a machinegun under 26 U.S.C. section 5845(b) because

13

"when activated by a single pull of the trigger, [it] initiates an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." *Id.* at pp. 2-3.

According to the Congressional Research Service, "ATF ... rulings ... are based upon the agency's best interpretation of current law and reported case law." *See* Memorandum on ATF Firearm Testing Procedures, p. 4 (Congressional Research Service: Oct. 19, 2005). Although the ATF was apparently willing to conform its Ruling 2006-2 to the <u>Staples</u> rule, the Government in this case refuses to do so. This Court should not condone the Government's refusal.

## III.    The Evidence Was Insufficient to Sustain Olofson's Conviction.

The Government has mistakenly assumed that, **if** the legal standard defining a machinegun is the one found in <u>Staples</u> footnote 1, then all that need be shown to rebut Olofson's claim of insufficiency of the evidence is that the ATF "test-fires" in **November 2006** and **February 2007** (the latter "test" being only a videotaping) showed that the AR-15 fired multiple rounds with a single pull of the trigger until either the ammunition was exhausted or the trigger released. *See* Govt. Br., pp. 24-25.[2] However, the Government has completely overlooked the uncontested fact that

---

[2]    To be sure, the Government expert testified that the November 2006 test fire showed that Olofson's AR-15 fired multiple rounds until the ammunition was exhausted or the trigger was released, but he did not so testify about the firing of the AR-15 video taped in February 2007. Rather, he testified only that the video tape showed only that the AR-15 had fired "more than one round without manual reloading by a single function of the trigger." *See* Tr. 110, l. 9 – 112, l. 18. In an

14

Olofson could not have known on July 13, 2006 — the date of the allegedly illegal transfer of his AR-15 — the results of either of the two "tests." *See* Olofson Br., p. 31. Therefore, even the "underlying facts" of either the November 2006 test or the February 2007 videotaping could not possibly establish a violation of 18 U.S.C. section 922(o) because, under the <u>Staples</u> rule, to sustain a conviction, Olofson would have had to know **at the time that he is alleged to have committed the offense** that the AR-15 had "each of the statutory elements that criminalize otherwise innocent conduct." *See* <u>United States</u> v. <u>X-Citement Video, Inc.</u>, 513 U.S. 64, 72 (1994). Otherwise, the law prohibiting possession or transfer of a machinegun would "make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons." *See* <u>Staples</u>, 511 U.S. at p. 620.

The Government has made no effort to review the sufficiency of the evidence to establish that Olofson knew, on the date that he loaned the AR-15, that the rifle would fire more than one round at the single pull of the trigger until the trigger was released or the ammunition was exhausted. Rather, in its statement of facts, the Government has made several inaccurate statements about Olofson's knowledge at the time of the transfer. *See* Govt. Br., pp. 4-8.

---

attempt to bridge this evidentiary gap, the Government has suggested that "Olofson appears to [have] acknowledged that, in the videotaped test-fire conducted in February 2007, his weapon fired the entire 20-round magazine 'with the single pull of the trigger,'" citing page 27 of the Olofson brief. Govt. Br., p. 25. **This is not true.** What Olofson "acknowledged" is what the trial judge had said at sentencing about the video taped firing. *See* Olofson Br., p. 27 and Sent. Tr. 11, ll. 9-14.

15

First, the Government has erroneously asserted that "[w]hen Kiernicki asked

him about the unmarked selector position [on the firearm loaned to him by Olofson],

Olofson **acknowledged that it was an automatic setting."** Govt, Br., p. 5

(emphasis added). **Olofson made no such statement.** Instead, Kiernicki merely

testified that Olofson "mentioned that it doesn't work [in that setting] and that it

would jam up." Tr. 38, ll. 8-14. *See also* Tr. 38, ll. 17-21; p. 46, ll. 11-15.

Second, the Government has erroneously stated that "[w]hen the [Berlin police]

officers told Kiernicki that someone had called about automatic gunfire, Kiernicki

acknowledged that he had fired Olofson's gun in **fully automatic mode**." Govt.

Br., p. 6 (emphasis added). In fact, Kiernicki **made no such statement**. *See* Tr.

40, ll. 3-24. Rather, Kiernicki recalled that he had told one of the Berlin police

officers that Olofson had told him that "the three round burst does not work because

[the firearm] was missing some type of thing." Tr. 46, ll. 3-10.

Third, the Government has erroneously avowed that "[w]hen Kiernicki told

Olofson that he had been firing Olofson's gun in automatic mode, and that the

police had responded to a complaint of automatic fire, Olofson responded that he —

Olofson — had fired **guns** in **fully automatic mode** at the conservation club and

never had any problems." Govt. Br., p. 6 (emphasis added). What Kiernicki

actually said was **dramatically different**, namely, that Olofson has said that he

"never had trouble with the police **shooting an automatic gun** at the

Conservation Club...." Tr. 41, l. 2-7. What Kiernicki understood Olofson to have

meant by such a statement, even assuming it was actually made, was never explored.

Fourth, the Government has erroneously stated that during an interview with an ATF agent, "Olofson acknowledged that he had loaned the gun to Kiernicki, but **denied knowing it fired automatically."** *See* Govt. Br., p. 6. The actual trial testimony was **dramatically different**:

> Q.    [Prosecutor] You told Mr. Olofson that the gun had fired automatically?
>
> A.    [ATF agent] Yes.
>
> Q.    And he said that if that happened then it was a malfunction.
>
> A.    Yes.
> [Tr. 68, ll. 13-16].

In sum, the Government has failed to identify any evidence establishing criminal *mens rea* at the time of the July 13, 2006 transfer. *See* Olofson Br., pp. 31-33.

## IV.    The Dictionary Definitions Cited Do Not Support the Government's Idiosyncratic Reading of "Automatically."

The Government contends that its definition of a machinegun — that is, a firearm that fires more than one shot at the single pull of a trigger, without regard to whether the trigger is released or the ammunition is exhausted — is supported by *Merriam-Webster's Collegiate Dictionary* and *The Random House Dictionary of*

17

*the English Language*, and argues that any reasonable person would have known

that.  Govt. Br., pp. 27-28.  The Government is mistaken.

While the dictionary definitions quoted by the Government do not include any

specific reference to the necessity of not releasing the trigger or exhausting the

ammunition as part of the definition of "automatic," none of them affirms the

Government's contention that "automatic" includes **any** firearm that "shoots more

than one shot with a single pull of the trigger," as it repeatedly stated before[3],

during[4], and at the close of[5], the trial in this case.  To the contrary, each of the

definitions quoted in the Government's brief constitutes language describing an

automatic firearm that contains a mechanism **designed** to enable a firearm to fire

repeatedly.  Yet, in this case the Government has contended that a machinegun

would include any weapon that fired more than one shot with the single pull of the

trigger — "no matter what the cause —"[6] by design or malfunction.  *See* Olofson Br.,

pp. 4, 6-7, 10-11.

---

[3]    *See* Olofson Br., p. 23.

[4]    *See* Olofson Br., pp. 20, n.7 and 25, n.12.

[5]    *See* Olofson Br., pp. 20, 22, 25.

[6]    *See* Olofson Br., p. 24.

18

**V.     The Government Has Failed to Rebut Olofson's Claim That the Trial Court's Exclusion of the Defense Expert Was Prejudicial Error.**

The Government asks this Court to uphold the trial court's order barring the defendant's firearms expert from the courtroom while the Government's firearms expert testified, despite the fact that this prevented the defense expert from: (i) assisting defense counsel in preparing cross-examination in a highly technical area; and (ii) rebutting erroneous expert witness testimony based on what he heard in court, thereby resulting in prejudice to the defendant. *See* Olofson Br., pp. 39-47. Not a single case cited by the Government supports the Government's contention that exclusion of the defense expert was neither an abuse of discretion nor prejudicial.

**A.     The Trial Court's Ruling Deprived Olofson of Expert Testimony Contrary to the Provisions of Rule 703.**

The Government cites two Seventh Circuit cases for the proposition that Fed.R.Evid. 615 "is designed to thwart witnesses from fashioning their testimony to that which has already been given and to help in detecting testimony that is less than truthful." Govt Br., p. 29. Neither case is apposite. Both concern the application of Rule 615 to **fact witnesses**, not **expert witnesses.** *See* United States v. Williams, 136 F.3d 1166 (7th Cir., 1997); United States v. Gammon, 961 F.2d 103 (7th Cir., 1992). As Opus 3 Limited v. Heritage Park, Inc., 91 F.3d 625 (4th Cir., 1996), cited by the Government, states:

> Because Rule 615 is **designed to preclude fact witnesses** from shaping their testimony based on other witness' testimony, it **does not mandate the sequestration of expert witnesses** who are to give

19

*only* expert opinions at trial.  Indeed, **an expert** who is not expected to testify to facts, but only assumes facts for purposes of rendering opinions, might just as well hear **all of the trial testimony** so as to be able to **base his opinion** on more accurate factual assumptions. [Heritage Park, at 629 (italics original) (emphasis added).][7]

In United States v. Crabtree, 979 F.2d 1261 (7th Cir., 1992), *cert. denied*, 510

U.S. 878 (1993), cited by the Government, this Court found no abuse of discretion by

a trial court's having permitted an FBI agent to testify as an expert even though

the agent stayed in the courtroom after entry of an order to exclude all witnesses:

Rule 703 of the Federal Rules of Evidence specifically states that an **expert** can base his opinion on the facts and data learned from attending the trial and listening to testimony....  [T]here is little if any difference between counsel disclosing prior testimony to an **expert** and having an **expert** listen to such testimony in the courtroom.  [*Id.*, 979 F.2d. at 1270 (emphasis added).]

What the Government asked for — and received — in Crabtree, it would deny to

Olofson here — and on the flimsiest of grounds.  The Government argues that the

defense expert was not hampered by his being sequestered during testimony by the

government firearms expert, as "the defense [i] had access to [the government's

expert's] reports, which covered the same topics as did his trial testimony; and was

free to inspect before trial not only [ii] Olofson's gun, but also [iii] the videotaped

test-fire of the gun."  Govt. Br., p. 30, n.3.  Such possible"substitutes" for observing

the Government's expert's trial testimony were, in fact, not adequate at all.  *See,*

---

[7]    *See also* Morvant v. Construction Aggregates Corp., 570 F.2d 626, 629 (6th Cir., 1978) ("We perceive little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case.").

20

*e.g.*, <u>United States</u> v. <u>Seschillie</u>, 310 F.3d 1208, 1214 (9th Cir., 2002) (review of trial transcript imperfect substitute for viewing and hearing live testimony).

Furthermore, the Government simply ignores the list of various specific items of prejudice itemized in Olofson's opening brief, namely, that:  (1) the Government's firearms expert testified at variance from his written reports stating that what he wrote in his report was "misspeaking on my part" about a critical matter — the type of ammunition used in the second test (*See* Tr. 127, ll. 3-9; Olofson Br., pp. 45-46); (2) the defense expert, when he finally was allowed to see the rifle at trial during a lunchbreak, was not allowed by the Goverment to touch the rifle (*see* Olofson Br., p. 44, n.14); and (3) the videotaping of the rifle occurred on February 24, 2007, before Olofson's initial counsel was replaced by the Court, and well before the defense expert was engaged by trial counsel (R. 38, p. 1).  Moreover, the record does not reflect that the defense expert was free to inspect Olofson's gun and the videotape. Actually, the Government refused to provide a copy of its videotape to the defense before trial, thereby effectively preventing the defense expert from seeing it until trial.  *See* Olofson Br., p. 42.  Finally, rather than demonstrating simplicity of the issues, the Government's brief seeking to explain its own witness' testimony about "free floating firing pins" (Govt. Br., pp. 34-35) itself illustrates why having a defense expert in the room was essential to the effective cross-examination of FEO Kingrey.  *See* Olofson Br., pp. 45-47.

In short, the trial court abused its discretion in excluding the defense expert from the courtroom during the testimony of the Government expert.

**B.    The Government Has Not Carried Its Burden to Show that Olofson Was Not Prejudiced by Excluding the Defense Expert.**

The Government implies that Olofson has the burden of proof to demonstrate that he was prejudiced by the trial court's ruling.  Govt. Br., p. 30.  While Olofson has the burden to make a "fair showing" that the expert was required for the management of the case, the Government has the burden of demonstrating that Olofson was not prejudiced by misapplication of Rule 615.  *See* Olofson Br., pp. 44-45.  The Government has not sustained that burden.[8]

As pointed out in Olofson's opening brief, the trial court gave no reason for its decision to exclude the defense expert (*see* Olofson Br., p. 41) even though the normal process is "to explain the factors it considered in reaching the decision."  *See* United States v. Jackson, 60 F.3d 128, 137 (2nd Cir., 1995), cited by the Government.  In this case, the Government had agreed to the normal procedure allowing experts to be present during the presentation of the other party's case.  Reversing course, the Government's motion to exclude him was offered mid-trial.  The district court, after hearing argument, inexplicably excluded him, offering no basis for the decision.  It is enough that Olofson has demonstrated how the court's

---

[8]    The Government asserts that "[r]eversal is appropriate only when a defendant can demonstrate prejudice," citing United States v. Green, 324 F.3d 375, 380 (5th Cir., 2003).  In Green, the district court permitted multiple case agents at trial for the government, and Green "has not identified any specific prejudice he suffered," a situation completely different than the instant case, where the defense expert was excluded and prejudice was alleged and demonstrated.  Olofson Br., pp. 42-47.  *See, e.g.*, Seschillie, 310 F.3d 1208, *supra*; Malek v. Federal Insurance Co., 994 F.2d 49, 53-54 (9th Cir., 1993).

22

action adversely impacted his defense.  *Compare* Olofson Br., pp. 39-47 *with* Govt.

Br., pp. 30-36.

## VI.    The Trial Court Committed Prejudicial Error in Denying Olofson's Discovery Requests.

The Government claims that (i) "Olofson has not established that the

government failed to disclose material, exculpatory evidence in violation of *Brady*"

(Govt. Br., p. 37), and (ii) Olofson "has not demonstrated a reasonable probability

that, had the evidence been disclosed to the defense, the result of his trial would

have been different."  (*Id.*, p. 40.)  However, the Government's superficial analysis

regarding the significance of the requested documents cannot dispel the prejudice

already demonstrated by Olofson.  *See* Olofson Br., pp. 47-50.

First, the Government **refused to produce even a single sheet of paper**

material to the preparation of Olofson's case, violating fundamental fairness under

the rules of criminal discovery procedure and, ultimately, due process.

In the court below, the materials sought by Olofson — for example, documents

demonstrating how early AR-15 rifles were manufactured with M-16 parts

(Defendant's Request #4) — were directly **relevant to Olofson's knowledge — or**

**lack of knowledge** — of whether the AR-15 he possessed reasonably could have

been considered a machine gun.  Documents describing ATF testing standards

(Defendant's Request #2) were directly relevant to Olofson's preparation of cross-

examination concerning possible violations of ATF's own procedures.  The

23

Government's claim that the material it refused to produce did not violate <u>Brady</u> because it was not "exculpatory" (Govt. Br., pp. 38-40) is insufficient, even if it were correct.  By avoiding the mandate of Federal Rule of Criminal Procedure 16.a.1.E.(i) to turn over material in its possession or control to the defendant if material to the preparation of the defense, the Government deprived Olofson of a fair trial.

Second, the **Government is incorrect in asserting that the materials sought by Olofson were not exculpatory**, particularly if they bore on the issue of a malfunctioning AR-15.  The Government's case was premised on a definition of "machine gun" that is at odds with the definition given by the Supreme Court in <u>Staples</u>, as well as with published ATF publications which are consistent with the articulation of that definition in <u>Staples</u>.  As to the Government's current claim that how M-16 parts came to be installed in Olofson's AR-15 is irrelevant to the actual criminal charge, the Government quotes with approval the district court's statement that it was not important that the Government establish that Olofson's AR-15 "was manufactured with M-16 parts."  Govt. Br., p. 39.  But this is inconsistent with how the Government attempted at trial to prove Olofson's "knowledge" of what constitutes a machine gun.  Olofson's defense was premised, *inter alia*, on the fact that any M-16 parts in his AR-15 had been installed by the manufacturer, and were responsible for the gun jamming (and sometimes firing more than one round on a particular setting).  It appears that the Government **withheld evidence of the fact** that the manufacturer was authorized to build its

24

AR-15 with certain M-16 parts, while making **the following statements to the**

**jury** with respect to Olofson's alleged knowledge and conduct:

> Here we have a case where not only do we have a firearm that Mr.
> Olofson transferred to Mr. Kernicki, an **AR-15 that has M-16 parts**
> and an AR-15 that with those **M-16** parts fires automatically; and not
> only do we have a defendant, Mr. Olofson, who is **acknowledging to**
> **a federal agent that he knows how to convert an AR-15 into an**
> **M-16**, but, as you heard yesterday, on Mr. Olofson's computer there's
> evidence of his ordering **M-16 parts**.
>
> There's also, on his computer, a conversion manual for converting
> AR-15s to M-16 machine guns.  And in that conversion manual it
> describes the replacement of AR-15 parts with M-16 machine gun
> parts, **the types of parts that Mr. Olofson was ordering**.  And,
> **with those M-16 machine gun parts installed in the AR-15, in**
> **Mr. Olofson's gun, that gun fires as an automatic**.
> [Tr. 192, l. 22 – 193, l. 10 (emphasis added).]

The Government claims the document it withheld in the face of Defendant's

Request #4 was not exculpatory, because the existence of M-16 parts in an AR-15

"has no bearing upon whether Olofson's weapon was a machinegun."  Govt. Br., p.

39.  That claim does not withstand scrutiny, and could be considered disingenuous

in view of the way the case was tried below, as confirmed by the Government

attorney's jury argument quoted above.[9]  Clearly, the Government attempted to

persuade the jury that Mr. Olofson inserted M-16 parts in his AR-15, in an effort to

convert it to a supposed automatic rifle, in direct contradiction to Olofson's defense

---

[9]     Indeed, the Government has engaged in analogous tactics in its brief
before this Court, pointing out — unnecessarily according to the government's
relevance argument — that the materials seized from Olofson included certain
manuals detailing procedures for converting semiautomatic rifles into fully
automatic rifles.  *See* Govt. Br., p. 7.

that any such parts in his AR-15 were installed by the manufacturer.  The letter from the manufacturer of Olofson's AR-15 — suppressed by the Government at trial — certainly was "material" exculpatory evidence which undermines confidence in the outcome below.  *See* <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434 (1995).  It supported the defense, and its non-disclosure, particularly in light of the evidence and argument presented by the Government, deprived Olofson of a fair trial.  *See id*.  The trial court's refusal to require the Government to disclose the document was prejudicial error.

Respectfully submitted,

_____

ROBERT E. SANDERS
  MARK BARNES & ASSOCIATES
  1350 I Street, N.W., Suite 1255
  Washington, DC 20005
  (202) 408-5030

HERBERT W. TITUS*
WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C
  8180 Greensboro Drive, Suite 1070
  McLean, VA  22102-3860
  (703) 356-5070

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.   That the foregoing Reply Brief of Appellant complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 6,724 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as the requirements of Seventh Circuit Rule 32(b), because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 13.0.0.568 in 12-point Century Schoolbook.


_____
William J. Olson
Attorney for Appellant

Dated: November 7, 2008

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Reply Brief of

Appellant was made, this 7th day of November, 2008, to the Clerk of Court,

electronically, and by FedEx, and to appellee by e-mail to greg.haanstad@usdoj.gov

and by submitting sufficient hard copies thereof by FedEx, addressed to counsel for

the appellee as follows:

Gregory J. Haanstad, Esquire.
U.S. Department of Justice (ED-WI)
Office of the U.S. Attorney
517 E Wisconsin Ave, Room 530
Milwaukee, WI  53202

_____
William J. Olson
Attorney for Appellant